**UNITED STATES of America,**
**Plaintiff,**

v.

**NATIONAL LEAD COMPANY, a corporation, and Chemical Workers' Basic Union Local 1744, AFL–CIO, Defendants.**

**No. 70 C 21(1).**

United States District Court,
E. D. Missouri, E. D.

June 1, 1970.

Daniel Bartlett, Jr., U. S. Atty., for plaintiff.

Boyle, Priest, Elliott & Weakley, St. Louis, Mo., for defendant National Lead Co.

Thomas, Busse, Weiss, Cullen & Godfrey, St. Louis, Mo., for defendant Chemical Workers' Basic Union Local 1744.

## MEMORANDUM OPINION

HARPER, Chief Judge.

This action is brought by the United States under the Civil Rights Act of 1964, Title VII, 42 U.S.C.A. § 2000e(a) to preliminarily and permanently enjoin the defendants from violating the Act and for money damages. The complaint alleges that defendants have engaged in and are presently engaged in employment practices which perpetuate the effect of past discrimination and constitute a pattern or practice of discrimination against Negroes on account of their race in hiring, promotion, transfer, layoff and recall, all in violation of Title VII, particularly Section 707 of the Civil Rights Act of 1964; and in violation of contractual obligations imposed by Executive Order 11246.

Defendant, National Lead Company, a New Jersey corporation (hereinafter referred to as Company), operates and maintains facilities in St. Louis, Missouri, known as the Titanium Pigment Division of National Lead. Defendant, Chemical Workers' Basic Union Local 1744, AFL-CIO (hereinafter referred to as Union), is the union representing all production and maintenance employees in the Company's St. Louis plant. The matter is presently before the court on the plaintiff's Notice and Motion for Preliminary Injunction sought in the complaint. The plaintiff declined to have the cause heard on the merits and the matter was heard by the court solely on the question of the preliminary injunction.

In his opening statement the attorney for the plaintiff requested extraordinary relief in the nature of a preliminary injunction for the reason that the departments within the Company's St. Louis plant were such that prior to 1962 Negro employees were assigned to one department, Labor, which locked them into low-paying and undesirable jobs, and that this was done with the intent to discriminate against them on the basis of their race and color. The plaintiff states that the effects of this past dis-crimination are carried forward to the present, affecting Negroes at the plant. The plaintiff stated that the immediacy and urgency of the situation is caused by current openings for extra vacation relief operators and openings in the near future in the guard staff.

The Titanium Pigment Division of National Lead, St. Louis, Missouri, employs approximately 1,400 persons. Of the total number of employees, about 25% are Negroes. The defendant Union represents approximately 1,100 production employees (of whom 821 are white and 254 are Negroes). There are four production departments in the division which have separate and distinct physical locations at the plant site: Titanium, Acid, Water and Power, and Stores. Two other departments in the division, the Labor Department and the Mechanical Department, disperse their employees all through the other departments of the division whenever they are needed.

Prior to 1962, all Negro employees were working in the Labor Department and seniority was based upon length of service in the department. Prior to 1963, employees in the Labor Department could not transfer out of that department to another department. Because seniority is dependent upon length of time in a department, employees hired before 1963 who were assigned to the Labor Department and who could not transfer to the Titanium, Stores, Acid, Mechanical, and Power and Water Departments, could not accrue seniority in any other department other than Labor, and consequently will always be junior to employees hired contemporaneously with them in the other departments if they transfer. The employees in the Labor Department hired prior to 1963 are said to have been "locked-in". Plaintiff contends that the employees who were locked in the Labor Department prior to 1963, and who could accrue seniority only in the Labor Department, are presently discriminated against because the effects of the past discrimination (all Negroes were in the Labor Department only) are being car-

ried forward to the present. That is, the seniority those employees accrued in the Labor Department during the years prior to 1963 when they could not transfer out of Labor, is lost when those employees transfer out of the Labor Department.

In March, 1963, under the collective bargaining agreement, a person employed in the Labor Department could bid into the Mechanical Department; and from the Mechanical Department he could bid into any other department, but he could not bid directly from the Labor Department to departments other than Mechanical. However, in March, 1969, as a result of negotiations, the collective bargaining agreement was changed so as to provide that those employees hired prior to March, 1963 (including the "locked-in" group) may bid into any department after departmental bidding. All other employees of the Labor Department, regardless of race, still have to bid through the Mechanical Department under the provision of the 1963 collective bargaining agreement. The plaintiff does not maintain that the system of seniority and inter-departmental bidding as it exists today is discriminatory against any employees other than those employees who were locked in to the Labor Department prior to 1963 and who now suffer the alleged carry-forward effect of that past discrimination. Thus, since March, 1969, there is no question that the persons in the locked-in group—those hired in Labor prior to 1963—can bid directly into any department in the division. The problem arises with respect to seniority and *not* access to or freedom of movement to the various departments.

From and after 1963 all employees of the Company have been under a dual system of seniority. Seniority based upon length of service in a particular department—departmental seniority—governs bidding on jobs within that particular department. Seniority based upon length of service with the Company—plantwide seniority—determines lay-off, demotion, transfers to other departments, and reassignment. The result is that when an employee changes departments, for purposes of the new department, he begins to accrue seniority as of the time he begins work in the new department. He retains his accumulated plantwide seniority for other purposes, but he does not carry over the plantwide seniority to the new department for purposes of bidding and bumping in the new department. Should the new employee be bumped back into his old department as a result of a force reduction, he retains the seniority accrued in the old department and begins gaining seniority again in that department. Likewise, he retains the seniority gained in the new department. When a vacancy occurs in any department, the job is open to bid first within that department. If no bid is received from within the department, or if departmental bids create successive vacancies, employees from other departments can bid on the job and the job is awarded on the basis of plantwide seniority.

The plaintiff contends that the use of departmental seniority combined with the prior discriminatory policy of assigning Negroes to Labor denies Negroes the opportunities which are comparable to those enjoyed by non-Negro employees. It is the position of the plaintiff that plantwide seniority should prevail in all department lines and for all purposes. Thus, if a vacancy occurs in the Titanium Department and two bids are received—one from an employee in Labor with twenty-five years' seniority in the Labor Department, and one from an employee in the Titanium Department with twenty-four years' seniority in Titanium—the employee in Labor is presumed to be qualified and would be awarded the job based on his greater seniority. The plaintiff contends that the Company is then required to give the transferring employee whatever training is necessary to qualify him for the job. (Plaintiff concedes that if after a reasonable amount of training the transferring employee does not become qualified, he need not be retained in the job.)

Prior to 1962, there were no Negro employees in any department other than Labor. However, there have been white employees in Labor continuously since 1939. There is no allegation of discriminatory practices in assignment of duties into departments since 1963. The record discloses that there is no racial assignment pattern at the present time. There are Negroes in departments other than Labor and there are white employees in Labor. One of plaintiff's basic contentions is that Labor jobs are lower paying and less desirable than jobs in the other departments. Plaintiff certainly did not prove the allegation and there is evidence to the contrary. Labor Department employees work only day shifts. The employees in the operating departments are required to work three shifts in rotation: One week day shift, one week swing shift, and one week night shift. The plant is operated 24 hours a day, seven days a week.

Although the evidence was inconclusive as to the current comparative pay scales, plaintiff produced one witness from the Labor Department who testified as to his rate of pay and working conditions. Mr. McMurtney, a packer, earns an hourly rate of pay of $4.06½. He is required to pack 720 bags in an eight-hour shift. He testified that it takes him approximately 6 hours to complete his quota of 720 bags. When his quota is completed he is not required to do any more work. He is then free to go to a room provided by the Company, where he can relax, eat, etc. Thus, there appear to be reasons why one would not want to transfer out of the Labor Department. In fact, evidence was adduced to the effect that one employee who bid out of Labor voluntarily bid back into the Labor Department because of the more desirable working hours.

Further evidence showed that since March, 1969, there were 84 openings available for bid by Labor Department employees, and only 22 of these were bid. The record is replete with instances where openings available for bid by Labor employees were filled from the streets. Plaintiff has not established that Labor jobs are lower paying or less desirable than other jobs at the plant. But assuming that Labor jobs are less desirable and lower paying, the court finds that plaintiff has not shown circumstances sufficient to issue a preliminary injunction.

Plaintiff's request for relief in the nature of a preliminary injunction is based upon its contention that the above described seniority system constitutes *prima facie* showing of probable violations of the Act, and that irreparable injury is presumed from such a showing.

In support of its position, the plaintiff cites United States v. Sheet Metal Workers Int'l Association Local Union No. 36 et al., 416 F.2d 123 (8th Cir. 1969); Local 189 United Papermakers and Paperworkers et al. v. United States, 416 F.2d 980 (5th Cir. 1969) (Crown Zellerbach case); United States by Mitchell v. Hayes International Corp., 415 F.2d 1038 (5th Cir. 1969); and Griggs v. Duke Power Company, 420 F.2d 1225 (4th Cir. 1970). Plaintiff particularly relies on the *Hayes* case in support of its contention that irreparable harm is presumed where there is a prima facie showing of probable violation of the Act. It is the opinion of the court that plaintiff did not meet its burden of showing a need for a preliminary injunction and did not establish a prima facie showing of discrimination.

The usual prerequisite to the issuance of a preliminary injunction is a showing that irreparable injury will result if the defendant is not enjoined. Mitchell v. Ballenger Paving Company, 299 F.2d 297 (5th Cir. 1962); Arrington v. Massachusetts Bay Transportation Authority, 306 F.Supp. 1355 (D.Mass.1969).

In United States by Mitchell v. Hayes International Corporation, supra, the Court of Appeals for the Fifth Circuit found the defendant Hayes to be in violation of the Act. The evidence showed that Negro employees had been segregated in their jobs and deprived of op-

portunities available to white employees. In April, 1969, the Company enacted a plan for reformation and compliance, opening 57 of a total of 140 jobs to Negroes. Negro employees were given only one chance to transfer. If the job were then offered to the Negro and he did not accept, his rights were then waived under the new program. Hayes retained the power to defeat the objectives of the Act. Upon record evidence proving a violation of the Act, the court stated, 1.c. 1045:

" * * * We take the position that in such a case, irreparable injury should be presumed from the very fact that the statute has been violated. Whenever a qualified Negro employee is discriminatorily denied a chance to fill a position for which he is qualified and has the seniority to obtain, he suffers irreparable injury and so does the labor force of the country as a whole."

In the present case, members of the Labor Department hired prior to 1963 may bid into any and all departments. *Hayes* does not relieve the plaintiff from its obligations to show a pervasive pattern or practice of discrimination in violation of the Act. Indeed, in *Hayes* there was an aggravated combination of discrimination before and after the effective date of the Act which justified laying aside the traditional equity criteria.

In the *Crown Zellerbach* case [Crown Zellerbach Corp. v. Wirtz, D.D.C.1968, 281 F.Supp. 337] the court found that the seniority system carried forward the discriminatory effect of former practices. The company had maintained segregated lines of progression, with a white union and a Negro union. The Negro union had jurisdiction over the lowest paying and most undesirable jobs. The best Negro jobs, for the most part, were worse than the worst white jobs. Job seniority determined promotions. In 1966, the lines of progression were merged—but in fact the Negro line was merely tacked to the bottom of the white line. The court specifically concluded

that the company's mill did not depend upon maintenance of the job seniority system and that to the extent that there was no business necessity for the carrying forward of the effect of past discrimination, the defendant committed, with the requisite intent, an unfair employment practice as defined by Title VII.

The court was careful to point out that the Act does not require preferential treatment on the basis of race and cited an important section of Title VII:

"(j) Nothing in this subchapter shall be interpreted to require any employer, employment agency, labor organization, or joint labor-management committee subject to this subchapter to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number of percentage of persons of any race, color, religion, sex or national origin employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area. 42 U.S.C.A. Sec. 2000e–2(j)."

In the *Sheet Metal Workers* case, there were two unions, but no company involved. Local 36 had no Negro members at the date of trial and only three Negro apprentices. Local 1 did not admit its first Negro until 1966. Both unions operated hiring halls. Both unions discouraged members from working on jobs where Negroes were employed and neither attempted to organize Negroes until 1966. Both unions divided their members into priority groups, and in or-

der to be placed in the higher groups one needed experience in the industry under the collective bargaining agreement. Thus, Negroes could expect to attain only the lowest of the designated groups. Job assignments were based upon the groupings.

In each of the above cases there existed, in addition to proven discriminatory practices both prior and subsequent to the Act, lines of progression. There are no lines of progression in the present case. Plaintiff had originally contended that such lines existed, but in its Proposed Findings of Fact at page 9, plaintiff states:

> "24. There are no lines of progression within departments at National Lead. The bidder with the greatest departmental seniority is awarded the job. In the case where there are no bidders within a department, the individual hired before March 13, 1963, with the greatest plant seniority is awarded the open job. If there is a question as to the successful bidder's ability to do the work, the individual is entitled to demonstrate his ability on the job."

There is no "lock-in" of an entire generation and there is no prohibition on upward or lateral mobility in the present case. The only issue is whether or not the system of departmental seniority is lawful.

The plaintiff contends that the defendants' departmental seniority system should be merged so that plantwide seniority would be in effect for all purposes. Plaintiff argues that Labor Department jobs are functionally and geographically related to the production department jobs, and, therefore, no business necessity exists for separate departmental seniority. There is virtually no evidence before this court as to the functions of the various departments, and there is absolutely no evidence of detailed job descriptions from which this court can conclude that the job duties of the various departments are functionally so related that departmental seniority is not justified. The lack of evidence concerning descriptions of job duties also makes impossible any conclusion as to whether the Labor Department consists of the "least desirable and lowest paying jobs."

Unions have historically expended great effort to attain and preserve seniority rights which are extremely beneficial to its members. In this case, the evidence shows that defendant Union has negotiated and bargained for increasingly beneficial seniority provisions in its collective bargaining agreement with National Lead. The seniority system in question here is governed by the collective bargaining agreement. Congress recognized the importance of seniority systems when it passed § 703(h) of Title VII, providing:

> "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, * * * provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin * * *."

It is true that a seniority system that unlawfully discriminates against Negroes is not a bona fide seniority system. See, Quarles v. Philip Morris, 279 F.Supp. 505 (E.D.Va.1967), quoted in Local 189 United Papermakers and Paperworkers et al. v. United States, supra. However, in the present case the question of whether or not this is a bona fide seniority system not the result of an intention to discriminate on the basis of race or color is a matter to be determined on the merits, plaintiff having failed to establish a need for preliminary injunction.

Counsel for plaintiff has urged this court to rapidly dispose of the issue of the preliminary injunction because of current openings for extra vacation relief operators. It appears that National Lead employees receive six or seven

weeks' vacation each year and that extra relief operators are hired to take the place of the vacationing employees. These jobs are posted for bid. Although plaintiff contends that Negro employees will be irreparably harmed unless a preliminary injunction is granted because the vacancies will be awarded to white employees with less seniority, the court disagrees.

The evidence shows clearly that the relief operator positions were posted in December, 1969. None of the jobs was bid, although the jobs could have been bid by Labor Department employees hired before March, 1963. In fact, by the date of the hearing for the preliminary injunction the vacancies were no longer posted, having been posted for the required length of time and then removed. The positions had to be filled by hiring from outside the plant. The plaintiff failed to show a need for the immediate, extraordinary relief of preliminary injunction with respect to the openings for vacation relief operators.

Plaintiff alleges that the defendants are presently engaged in employment practices (apart from the present-effect-of-past-discrimination) which violate the Civil Rights Act of 1964 in the selection of foremen, plant guards and clerical employees. The gist of plaintiff's claim is that "obviously qualified" Negroes are being denied jobs as foremen, plant guards and clerical employees on account of their race and color.

■ Plaintiff has advised the court that in the very near future there will be two openings in the guard force, and that unless the court issues a preliminary injunction Negroes will be irreparably harmed when the Company fills these vacancies. The Company presently maintains a guard force of 20 men. The record discloses that since 1962 six vacancies on the guard force have been filled, three of them by Negroes. The first Negro guard was hired in 1968. The evidence further showed that although two of the plant guards will retire within the next two months, the vacancies thereby created will not be filled.

Due to the construction of new gatehouses, the Company is reducing the size of the guard force by two by attrition. This evidence falls far short of showing past or imminent discrimination in hiring practices relative to the guard force, or that positions on the guard force will be opening soon. No need for a preliminary injunction has been shown with respect to the guard force.

■ However, there is further reason for not granting the requested relief with respect to the guard force. The plant guards are represented by the Oil Chemical and Atomic Workers Union which has not been made a party to this lawsuit. National Lead has sole discretion in hiring plant guards. However, the terms and conditions of employment of the guards is governed by a collective bargaining agreement entered into between the Oil Chemical and Atomic Workers and the Company. The relief requested here certainly affects the terms and conditions of the employment of the guard force—and, therefore, the contract. Yet any judgment in this lawsuit is not binding on those not parties to the suit, including the union representing the plant guards. See, Rule 19, Federal Rules of Civil Procedure; Bremer v. St. Louis Southwestern Railroad Company, 310 F.Supp. 1333 (E.D.Mo. 1969).

Therefore, the relief requested concerning the guard force is denied.

■ The selection of foremen is at the discretion of defendant National Lead and is primarily based upon a chain of recommendations, although in some departments a test is also used, in addition to the usual considerations. Currently, there are about 100 foremen, of which three are Negroes. Aside from that statistic, the only evidence produced by plaintiff on the matter is a letter admitted into evidence, over objection, "for what it is worth", since the matter was heard by the court. The letter, dated January, 1967, written by an employee of National Lead to the Atomic Energy Commission, lists the names of 32 Negro employees who, in the writer's opinion,

could become qualified for supervisory positions after reasonable training. As of November, 1969, none had been transferred to a supervisory position. Such evidence is, at best, inconclusive to show discriminatory selection of foremen. But when other evidence is also considered, it becomes even less so.

It is to be noted that there is no evidence that any of the 32 individuals named in the letter, or any employee, has become qualified for the job of foreman or supervisor and has then been denied the position. No witness testified that he was denied such a position on the basis of his race.

There is no testimony to the effect that the Company sought out potentially qualified individuals and personally offered to help them develop their potential. However, there is evidence that National Lead maintains an education program under which it refunds up to one hundred percent of the cost of any course taken to develop potential. The program has been in effect for many years and is available to any employee, regardless of race, creed or color.

The program has been publicized by posting notices at timeclocks and elsewhere, by distributing pamphlets and by the in-plant informational program for recorded messages called "Dial 7". The Company also provides for bidding for on-the-job training in other departments. Such a transfer is accomplished at a cost of about $1,000.00 to the Company. The Company provides on-the-job training by having an experienced man work alongside the new employee for a period of time for instruction. The instructor receives time and a half and the transferring employee is paid and accrues seniority. Several of plaintiff's witnesses testified that they were familiar with the Company's educational programs and their availability.

The positions of supervisor and above have a minimum educational requirement of an engineering degree or the equivalent. None of the 32 persons named in the letter as having the poten-

tial of becoming qualified for a supervisory position has such a degree and none has taken advantage of the Company's offer to bear the entire cost of becoming qualified.

The inference of racial discrimination which plaintiff urges the court to make based solely upon the statistical information is permissible, but when all the evidence is considered the inference is simply not justified. There is no showing of unlawful discrimination in the selection of foremen.

■ Under Title VII, Section 707(j) it would be unlawful for the court to attempt reverse discrimination. The Act does not obligate the defendants to adjust racial imbalance which may exist.

■ Finally, plaintiff contends that obviously qualified Negroes have been rejected for clerical positions on the basis of their race and color. The evidence adduced concerning the three occasions since 1966 when Negro applicants for clerical positions have been rejected is totally and completely insufficient to show either that the three were obviously qualified or that they were rejected on the basis of their race and color.

Applications for the positions discussed herein were solicited and received from the Urban League and the Missouri State Employment Service.

Miss Doris Cobb, a Negro, testified that in October, 1967, she was referred by the Urban League to National Lead to apply for an opening in the position of "accounting clerk". Miss Cobb is a high-school graduate with six months of business school. Miss Cobb is presently a confidential secretary, but had had accounting clerk experience at the time of her application.

At National Lead, Miss Cobb was given an application to fill out and a test consisting of several "figure problems". At its conclusion, she was advised that she had failed the test. Miss Cobb did not claim that in fact she had passed the test or that a white person was hired in her stead. Miss Cobb did testify that her request to work the test on machin-

ery was denied, but there is no allegation and no proof that the test was unrelated to the job being sought, that it was administered unfairly, or that it was racially oriented.

Job oriented tests are proper. United States v. Sheet Metal Workers International Association Local Union No. 36, supra. Absent some indication that the test was improper or that Miss Cobb did in fact pass the test, this court cannot conclude that Miss Cobb was rejected on the basis of her race.

Miss Lillian Mitchell was referred to National Lead by the Urban League to apply for an opening in the position of secretary. Miss Mitchell has an educational background of two years' college and one year business school. At the present time, Miss Mitchell is an assistant editor of a Missouri Teamster publication and an assistant to a public relations director, but at the time of her application she had had experience as a secretary, and was teaching clerical subjects at adult night education. Miss Mitchell testified that she is a member of the "Afro-American" race.

At National Lead, Miss Mitchell submitted a resume and completed a job application. She was then given dictation for five minutes at 80 words per minute and asked to transcribe it. Miss Mitchell testified that at the time she could type 70 to 75 words per minute and could take shorthand at 90 to 100 words per minute. However, the transcript of her dictation introduced into evidence shows that the test was not completed. Miss Mitchell did not transcribe the dictation given her. She did not know whether the Company had hired a white person or a Negro for the position.

Again the evidence falls short of showing that Miss Mitchell was rejected on the basis of her race. The test was certainly job-oriented and there is no evidence that it was administered unfairly or was racially oriented. Although Miss Mitchell claims to have been qualified, the test was incomplete.

The third witness, Miss Barbara Martin, a Negro, was referred to National Lead in January, 1969, by the Missouri State Employment Service for an opening in the position of keypunch operator. Miss Martin testified that she attended one year of college, keypunch, and computer school, although her testimony was inconsistent as to the dates of attendance, and she dropped out because her grades "weren't too good". At the present time, Miss Martin is a health inspector for the City of St. Louis, although she had had experience as a keypunch operator at the time of her application at National Lead.

At National Lead, Miss Martin completed an application but was told that she did not have sufficient experience, and did not get the job. The record indicates that an error was made in the job specifications transmitted to the Missouri State Employment Service. The original specifications incorrectly stated the required experience as one year—and Miss Martin was referred on that basis. It was corrected to state the experience requirement as five years. Miss Martin did not have five years' experience. There is further evidence that Miss Martin was not rejected on the basis of her race.

The position was actually filled by a company employee with the necessary qualifications and skill who bid on the opening in accordance with the collective bargaining agreement with the Oil Chemical and Atomic Workers. The position is currently held by a Negro.

The above three incidents neither separately nor cumulatively show discrimination against Negroes as is necessary to authorize the extraordinary remedy of a preliminary injunction. There is a failure of proof. In addition, as with the claim relating to the guard force, plaintiff's request for relief with respect to transfer concerning clerical employees must fail because plaintiff has not made a party to this lawsuit the union representing clerical employees, the Oil Chemical and Atomic Workers. Any relief granted here would not be binding on that union.

Although plaintiff requests a permanent injunction and an unprecedented prayer for damages in an amount equal to the back pay of all Negroes who could have bid into better paying jobs but for the departmental seniority system, this matter is presently under consideration on the question of the request for preliminary injunction only. In that regard, plaintiff has failed to prove facts that show that defendants are now intentionally engaged in a pattern or practice of resistance to the full enjoyment of Title VII rights.

Plaintiff failed to prove its allegations that the defendants are presently engaged in unlawful discrimination in the selection of foremen, plant guards and clerical employees. Plaintiff failed to prove its allegations that there are current openings for vacation relief operators or that in the near future there will be openings in the plant guard force. In addition, plaintiff failed to join the unions representing the plant guards and the clerical employees.

Plaintiff has shown that there is freedom of movement to all departments by those employees who are said to be affected by past discrimination. Plaintiff has shown that there exists a departmental seniority system, but has not shown that the system is not bona fide or necessary to defendant company's business. It is clearly a matter to be determined on the merits. This is particularly true in view of plaintiff's unproven allegations that Labor Department jobs are functionally and geographically related to the production department jobs, and that Labor Department jobs are less desirable and lower paying than production department jobs —matters that have a bearing on the propriety of the departmental seniority system.

The above memorandum is adopted by the court as its findings of fact and conclusions of law.

Plaintiff's motion for preliminary injunction is denied. The clerk will prepare and enter the proper order.