338 F.Supp. 1167 (1972)
UNITED STATES of America, Plaintiff,
v.
NL INDUSTRIES, INC., and Chemical Workers' Basic Union Local 1744, AFL-CIO, Defendants.
No. 70 C 21(A).
United States District Court, E. D. Missouri, E. D.
January 26, 1972.
*1168 Daniel Bartlett, Jr., U. S. Atty., St. Louis, Mo., David L. Norman, Asst. Atty. Gen., Civil Rights Div., Steven B. Glassman and Stuart P. Herman, U. S. Dept. of Justice, Attys., Washington, D. C., for plaintiff.
Boyle, Priest, Elliott & Weakley, St. Louis, Mo., for defendant National Lead Co.
Thomas, Busse, Weiss, Cullen & Godfrey, St. Louis, Mo., for Chemical Workers.

MEMORANDUM OPINION
HARPER, District Judge.
The defendants in this action when the suit was filed were National Lead Company, a corporation, and Chemical Workers' Basic Union Local 1744, AFL-CIO. On April 15, 1971, the corporate name of National Lead Company, a corporation, was changed to NL Industries, Inc., effective April 16, 1971. This change in name was called to the court's attention on June 24, 1971, and on said date, by court order, National Lead Company, a corporation, was stricken from the caption of this case and NL Industries, Inc., was inserted as a defendant in lieu thereof. All references to this defendant during the trial and in all pleadings were to National Lead Company. In this memorandum opinion, the defendant, NL Industries, Inc., shall be referred to as National Lead.
This action is brought by the United States under the Civil Rights Act of 1964, Title VII, 42 U.S.C.A. § 2000e(a) to permanently enjoin the defendants from violating the Act and for money damages. The complaint alleges that defendants have engaged in and are presently engaged in employment practices which perpetuate the effect of past discrimination and constitute a pattern or practice of discrimination against Negroes on account of their race in hiring, promotion, transfer, layoff and recall, all in violation of Title VII, particularly Section 707 of the Civil Rights Act of 1964; and in violation of contractual obligations imposed by Executive Order 11246.
Defendant, National Lead Company, a New Jersey corporation, operates and maintains facilities in St. Louis, Missouri, known as the Titanium Pigment Division of National Lead. Defendant, Chemical Workers' Basic Union Local 1744, AFL-CIO, is the union representing the production and maintenance employees in the Titanium Pigment Division Plant of National Lead, St. Louis, Missouri, which employs approximately 1,400 persons. Of the total number of employees, about twenty-five percent are Negroes. The defendant Union represents approximately 1,100 of the employees (of whom 821 are white and 254 are Negroes). There are four production *1169 departments in the plant which have separate and distinct physical locations at the plant site: Titanium, Acid, Water and Power, and Stores. Two other departments in the plant, the Labor department and the Mechanical department, disperse some of their employees all through the four above-mentioned production departments in the plant whenever they are needed. All employees in these six departments are represented by the defendant Union.
Prior to 1962, all Negro employees were working in the Labor department and their seniority was based upon length of service in the department. Prior to 1963, employees in the Labor department could not transfer from that department to another department, and consequently, could not accrue seniority in any department other than Labor and will always be junior to employees hired contemporaneously with them who have remained in the department in which they were hired if Labor department employees transfer to that department. The employees in the Labor department hired prior to 1963 are in this respect said to have been "locked-in". Plaintiff contends that the employees who were locked in the Labor department prior to 1963, and who could accrue seniority only in the Labor department, are presently discriminated against because the effects of the past discrimination (all Negroes were in the Labor department) are being carried forward to the present. That is, the seniority those employees accrued in the Labor department during the years prior to 1963 when they could not transfer out of Labor is lost when those employees transfer out of the Labor department.
In March of 1963, under the collective bargaining agreement, a person employed in the Labor department could bid into the Mechanical department, and from the Mechanical department he could bid into any other department, but he could not bid directly from the Labor department to departments other than Mechanical. In March of 1969, as a result of negotiations, the collective bargaining agreement was changed to provide that all employees hired prior to March 1963 might bid into any department after departmental bidding. All other employees of the Labor department, regardless of race, still had to bid through the Mechanical department under the provision of the 1963 collective bargaining agreement.
The plaintiff does not maintain that the system of seniority and inter-departmental bidding as it exists today is discriminatory against any employees other than those employees who were locked into the Labor department prior to 1963, and who now suffer the alleged carry-forward effect of that past discrimination. Thus, since March of 1969, there is no question that the persons in the locked-in group  those hired in Labor prior to 1963  can bid directly into any department in the division. The question before the court is with respect to departmental seniority and not access to or freedom of movement to the various departments.
All production and maintenance employees of National Lead are under a dual system of seniority. Seniority based upon length of service in a particular department  departmental seniority  governs bidding on jobs within that particular department, layoff within the department, time of vacation, and recall after a layoff to a department in which an employee has seniority. Departmental seniority is limited to the department from which an employee last transferred and his current department. Seniority based upon length of service with National Lead  plantwide seniority  determines the successful bidder for inter-departmental bids, length of vacation, layoff within the plant, recall after layoff to departments in which an employee has no seniority, insurance and annuity benefits. The result is that when an employee changes departments, for purposes of the new department he begins to accrue departmental seniority as of the time he begins work in the new department, and continues to accrue seniority simultaneously in the department *1170 from which he transferred. Should the transferred employee be bumped back into his old department as a result of a force reduction he continues to gain seniority in his old department to which he was bumped back and retains his seniority in the department from which he was bumped. Likewise, he retains the seniority gained in the new department. When a vacancy occurs in any department the job is open to bid first within that department. If no bid is received from within the department, or if departmental bids create successive vacancies, employees from other departments hired prior to March 14, 1963, can bid on the job which is awarded on the basis of plantwide seniority.
The plaintiff contends that the use of departmental seniority combined with the prior discriminatory policy of assigning blacks to Labor denies blacks the opportunities enjoyed by non-black employees. It is the position of the plaintiff that any vacancy in any line should be open for bid to blacks who were hired into Labor and that when such blacks bid on a job, plantwide seniority shall determine the successful bidder. If such black is the successful bidder he will retain his total plantwide seniority after a successful transfer to a department and shall compete within the new department on the basis of his plantwide seniority as against the plantwide seniority of other persons in his department. The terms of the collective bargaining agreement not inconsistent with this contention are to remain in full force and effect. Under such a system blacks hired into Labor would be permitted to bid into lines on jobs formerly first open only to departmental bidding while such privilege would be denied to others. Such a remedy would in effect grant blacks hired into Labor super-seniority in violation of 42 U.S.C. § 2000e-2(j), which provides:
"Nothing contained in this subchapter shall be interpreted to require any employer * * * subject to this subchapter to grant preferential treatment to any individual or to any group because of the race * * * of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race * * in comparison with the total number or percentage of persons of such race * * * in any community * * *."
A further effect would be that if a vacancy occurs in the Titanium department and two bids are received  one from an employee in Labor with twenty-five years' seniority in the Labor department, and one from an employee in the Titanium department with twenty-four years' seniority in Titanium  the employee in Labor is presumed to be qualified and would be awarded the job based on his greater seniority. National Lead is then required to give the transferring employee whatever training is necessary for the job. (Plaintiff concedes that if after a reasonable amount of training the transferring employee does not become qualified, he need not be retained in the job.)
Plaintiff further requests that employees whose jobs are classified in the Labor Department seniority group and whose geographical and physical work area is in another department, or whose job is functionally related to that of another department, be assigned to the latter department, transferring their Labor department seniority with them.
Absent a job description for the Labor department jobs as well as those in the other departments, it would be impossible for the court to say that the duties performed by the Labor department employees are functionally related to the departments in which they are physically assigned. It should be pointed out that many employees whose jobs are classified in the Mechanical department seniority group are also in a geographical and physical work area in other departments, but the plaintiff would not have them transferred to the departments where they physically work and take their seniority with them. Unlike the other departments, Labor is composed *1171 primarily of unskilled workers who, for instance, perform janitorial services, drive trucks, and haul and weigh material. Although employees in other departments occasionally engage in activity similar to some of those duties performed by Labor department employees, and vice versa, this alone does not show a racially motivated class-classification scheme. Merely because employees in different departments work in geographical proximity to one another, or even under common supervision, does not establish that the departments are based on artificial classifications. United States v. H. K. Porter Co., 296 F.Supp. 40 (N.D.Ala.1968).
Although white employees have been assigned to Labor since 1939, no black employees were assigned to any other department except Labor prior to 1962. At the present time there are blacks and non-blacks in all seniority groups.
It is plaintiff's contention that only by the abolition of the departmental seniority structure as to blacks can blacks, who have been hired into Labor, obtain more desirable jobs. Plaintiff has continuously argued that the Labor department is the least desirable in the plant. This argument is not supported by the evidence. Plaintiff's Exhibit 56 shows that the highest paid member of the defendant Union in the plant in 1969 in Labor was a black  J. Thigpen  who made $17,054.79, approximately $1,500.00 more than any other employee. The exhibit further shows that of those who made more than $14,000.00, the percentage of blacks in Labor in that category was higher than the percentage of blacks in the Union. Further, the dirtiest job in the plant is cleaning dust collectors, which is performed by operators or Mechanical department personnel, not Labor department employees. Furthermore, the Labor department employees often complete their jobs in four to five hours, after which they are permitted to remain in an employee lounge until the termination of their work day. The operating departments (Acid, Titanium and Water and Power), unlike Labor, are in operation twenty-four hours a day, seven days a week, as a result of which employees in these departments work on a rotating shift basis. Most of the employees in Labor work only days.
42 U.S.C. § 2000e-2(h) provides:
"Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin * *."
Plaintiff has cited cases in which the courts have merged seniority groups which had had the effect of presently discriminating against employees on the basis of race. Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969); United States v. Hayes International Corp., 415 F.2d 1038 (5th Cir. 1969); Griggs v. Duke Power Co., 420 F.2d 1225 (4th Cir. 1970); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2nd Cir. 1971). In none of the cases cited by plaintiff has an overriding legitimate, non-racial business purpose justified the seniority system as in the case at bar. Under the present system of inter-departmental bidding, one bid results in an average of three moves.
The cost to the company resulting from an initial opening is approximately $1,000.00, which is attributable to training the transferring employees in their new jobs. Under the seniority system suggested by the plaintiff, extensive mobility between departments would result due to the removal of the departmental bidding within lines. Exhibit C-1 is a chart depicting what can happen in a bidding system in a plant such *1172 as this if job openings are, each and every one, thrown open for plantwide bidding on an unrestricted plantwide seniority basis. This circle goes on to no end even while a second such neverending loop is started by an original vacancy. Such a system would result in prohibitive training costs for the company.
Harry A. Moon, the plant manager of the Titanium Division of National Lead, testified in detail concerning the duties of a Titanium operator. Titanium operators are involved in more than fifteen steps in the processing of ore, which includes the operation of machinery such as furnaces, rotary dryers, air blowers, exhaust fans, digest tanks, rotary vacuum filters, vacuum tubes, calcinators and cyclones. These apparatuses are manipulated by means of levers, valves, electrical devices, pumps, dampers and conveyors by which such variables as temperature, vacuum, rate of flow, quantity of gas, sulphuric acid, ore, reagents, levels of air, heat and pressure, and feed rate are regulated according to written specifications. An error by a Titanium operator during these processes could result in the loss of large quantities of raw material or a reduction in the quality of the finished product. Under the present system, highly complex jobs involving serious economic and safety repercussions in the case of error, such as that set forth above, are open to bid first within the department, thereby utilizing on-the-job experience within the line. Under plaintiff's plan, a porter in Labor whose primary duties are janitorial, would be permitted to bid on a Titanium operator's job absent any prior experience in that area.
While the duties of each job in each line in the plant were not detailed in evidence, the fact that a vacancy, as now filled, results in a thousand-dollar training cost to the company indicates operational differences in the various jobs as does plaintiff's concessions that transferred employees must be trained and that some are not trainable. The Fifth Circuit Court of Appeals in Local 189, supra, held that the maintaining of line seniority was not essential to business necessity in the plant involved before the court, but at page 993 distinguished a fact situation similar to the case at bar in which on-the-job training acquired by progression through seniority lines was necessary for satisfactory job performance. The court there said:
"In other words, the record in that case [United States v. H. K. Porter Co., 296 F.Supp. 40 (N.D.Ala.1968)], as the district court viewed it, showed that safety and [business] efficiency, the component factors of business necessity, would not allow relaxation of the job seniority system. We see no necessary conflict between Porter's holding on this point and our holding in the present case."
From the evidence before the court it appears that defendant National Lead's seniority system is based on a valid business purpose, that is, the functional differences in the duties within each seniority group, and is not a result of discrimination based on race.
As stated in the court's earlier opinion, United States v. National Lead, 315 F.Supp. 912, 915 (1970), since March 14, 1969, there have been enumerable opportunities for blacks hired before March 14, 1963, to bid into other seniority lines, but in approximately seventy-five percent of the openings no black has bid. From March of 1969 to the time of the trial there were 28 plantwide bid postings which encompassed 120 jobs. Most of these jobs were filled by employees hired from outside the plant. Six of the black employee-witnesses have availed themselves of these opportunities, five of whom are currently working in departments other than Labor. The court, therefore, finds that there is not only ample opportunities for, but also actual mobility among the blacks who are allegedly "locked in" the Labor department.
The testimony of several of the black witnesses that they were reluctant to *1173 bid into other departments reflects in part a lack of understanding of the 1969 Labor Agreement between their Union and National Lead. William Finney testified that he did not bid out of Labor because he would have to go through the Mechanical department. Finney obviously was unaware that the 1969 union contract specifically provides that he can bid directly into another department without accruing the usual year's seniority in the Mechanical department. The loss of his seniority was Orsell Bishop's reason for refusing to bid on openings in other departments, although under the union contract he would continue to accrue Labor seniority while in the new department. There are other reasons why an employee would not want to bid out of the Labor department.
Factors which influence decisions to bid or not to bid from one department to another include personal preferences concerning shift work and day work, such as that evidenced by William Newton's testimony, premiums connected with various jobs, car pools, etc.
Plaintiff has requested that blacks who bid into other departments be paid no less than their current salary. Not only would such relief on its face grant preferential treatment on the basis of race, but there is no evidence that the differential in pay scales between departments has a dampening effect on bidding between departments.
Plaintiff contends further that since the enactment of the 1964 Civil Rights Act, National Lead has discriminated against blacks in its hiring practices. According to a release of the United States Department of Labor on April 6, 1970 (Defendants' Exhibit D-1, p. 15), containing data collected by the Bureau of the Census as part of the Current Population Survey, less than 15.4% of the civilian labor force of the greater metropolitan area of St. Louis were black in 1969. Between July 2, 1965, and June 30, 1968, 28.9% of those hired by National Lead were black; between July 1, 1968, and December 31, 1968, 37.9% were black; between January 1, 1969, and December 31, 1969, 23.7% were black; and between January 1, 1960, and August 11, 1970, 15.9% were black.[1] In all time periods, the percentage of blacks hired was above the proportion of blacks in the labor force of greater metropolitan St. Louis. Approximately 51% of the blacks hired between the effective date of the Civil Rights Act of 1964 and August 11, 1970, have been assigned to departments other than Labor. Only approximately 34% of the total employees hired into Labor were black during this period.[2] This assignment pattern fails to show discrimination by National Lead in departmental hiring.
National Lead solicits recruits through several organizations including the Urban League and Job Opportunities Unlimited, both of which are Negro oriented employment referral services. Calls for the hiring of employees have for many years for the most part been placed through the Industrial Relations Department of the plant to the Missouri State Employment Office. Experience has shown that when the company puts out a call for skills it is largely members of the white community or race who respond to the call to fill vacancies for that type of work. When a call for unskilled labor is made, the larger proportion of applicants who respond are black.
Plaintiff has attempted to prove through the testimony of several black witnesses that National Lead refused employment to applicants on the basis of race. Thelma Louise Wiley was one such applicant who applied at National *1174 Lead for the position of laboratory assistant. She had completed her high school education, which included a course in Physics and one in Chemistry, and had also finished a college level course in Quantitative Analysis. At National Lead she was asked to fill out an application and was taken through the laboratory where she was introduced to the foreman who interviewed her at length. She was then told that she would be notified within two weeks if she was accepted. When Thelma Wiley was not notified she called National Lead and was informed that the job had been filled. Since a black, Sylvia Florian, was hired for the position sought by Thelma Wiley, race obviously was not a factor in her non-selection.
Daisy Ragland testified that she applied at National Lead for the position of laboratory assistant in October of 1966, that she had completed high school during a six-year period, and that at the time she was interviewed she was majoring in Science at Forest Park Community College and had partially completed a course in Biology there. When she applied, her father had for many years been working at National Lead, and two friends, who were both black, were employed in the laboratory. At the request of National Lead, she took an aptitude test designed by the Department of Labor, and administered by and at the Missouri State Employment Office. When she was not offered the position, she obtained her test scores and compared them with the test scores of the white applicant, who, she alleges, was awarded the position. She testified that she had in fact passed the test. On cross-examination, she admitted that she had applied to National Lead in February, not October of 1966, and that she had not even attended Forest Park Community College at that time. She also admitted that she did not know if she passed the test and that the white applicant had higher scores than she on some parts of the test. When confronted with the discrepancy in her testimony by the court as to passing or not passing the test, she invoked the Fifth Amendment privilege against self-incrimination.
The test given Mrs. Ragland was the United States Employment Service's General Aptitude Battery Test. Missouri Employment Service provides National Lead with ranges within which an applicant scores in certain aptitudes required for a job. 42 U.S.C. § 2000e-2(h) provides in part:
"* * * nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race * * *."
Plaintiff has failed to show that this test was discriminatorily designed or used or that Mrs. Ragland passed the test. Both Mrs. Ragland's credibility and qualifications for this position are highly suspect.
Several months later Mrs. Ragland again applied for employment at National Lead, but was told that there were no openings for the position she sought. Absent proof that there was an available position at that time for which she was qualified, the court cannot find that the failure of National Lead to hire her was based on racial considerations. Harold Crumpton, a black, who was hired in November of 1963 as a chemist assistant and in 1966 promoted to chief shift chemist (over blacks and whites), was at the time of the trial on leave from the plant attending Washington University under the National Lead educational program. He testified that since 1963 approximately ten blacks were employed as laboratory technicians or assistants. The evidence does not establish that Mrs. Ragland was refused employment on the basis of her race.
*1175 Four other black witnesses, William Raspberry, Latrelle Campbell, William Newberry and James Taylor, also testified that they had applied to National Lead for employment since the passage of the 1964 Civil Rights Act. Three of these applicants admitted that they were told that there were no openings or that there were none in the departments in which they sought to be assigned. When a vacancy did occur, William Newberry was notified, and he accepted a job in the Labor department. Within a few weeks after his interview with the Titanium Division of National Lead, James Taylor was hired by the Lead and Oil Works Division of National Lead.[3] Absent evidence of a discriminatory hiring pattern or proof that job openings existed when these individuals applied which were awarded to whites, this court cannot say that National Lead's refusal to hire these individuals was based on racial discrimination.
At the preliminary hearing, Doris Cobb, Lillian Mitchell and Barbara Martin testified concerning National Lead's alleged refusal to hire them on the basis of their race. No new evidence concerning these applicants was introduced at the hearing on the merits. The court, therefore, adopts its findings of fact made after the preliminary hearing relative to these witnesses, which as a matter of law failed to prove a racially motivated basis for the non-selection of these women. United States v. National Lead, supra, 315 F.Supp. at 919-920.
Plaintiff has made extensive use of statistics throughout the trial in order to prove a pattern of discrimination. In some cases the manner in which these figures were calculated and used reflects a lack of reliability and validity. For instance, Plaintiff's Exhibit 56 purports to represent the 1969 annual earnings of current employees as of October 5, 1970, who were employed prior to January 1, 1970. Byrne Belcher, the president of a data processing bureau, who holds a degree in Mathematics and a subdegree in Statistics from Washington University, testified concerning the incompleteness of the data. Many of the employees listed therein had not worked a full year. Other employees were not included. Any conclusion regarding the variance in yearly average of wages paid to blacks and whites based on this data would not be accurate. Plaintiff's Exhibit 15 lists for four separate occasions the number of black and white employees in the Labor department and in all other departments. The selective choosing of dates on which the variance between these groups in departments is high does not accurately reflect the overall composition of the plant during a time period. Other factors could also govern such proportions on a given date such as a more rapid turnover of blacks.
Plaintiff also contends that National Lead has discriminated against blacks in its selection of plant guards. The only new evidence at the hearing on the merits on this cause was the testimony of four black employees, William Finney, Otha Lindsey, Clinton Lorenzo Primm and Earl Howard, who said that they had applied for the guard force but had never been selected. The record at the preliminary hearing disclosed that since 1962 there have been only six vacancies on the twenty-man guard force. Three of these openings were filled by blacks. The evidence further indicated that due to the remodeling of the plant protection system the next two vacancies therein would not be refilled. Relative to the guard force, the evidence falls far short of showing that National Lead discriminated against any individual black or against blacks as a group in its selection of guards.
Several black employees have testified that they have never approached *1176 the management of National Lead concerning promotions to the position of foreman. No other evidence was introduced at the hearing on the merits on this issue. The findings of fact and conclusions of law set down by the court after the preliminary hearing concerning the allegedly discriminatory selection of foreman are adopted herein. United States v. National Lead Co., supra, 315 F.Supp. at 918-919.
Plaintiff contends that a pattern of discrimination against blacks is shown by National Lead's hiring practices and seniority system. The evidence presents an entirely different pattern. National Lead has actively recruited black applicants through two employment agencies who specialize in the placement of blacks. Every year since the enactment of the 1964 Civil Rights Act, National Lead has hired a significantly greater proportion of blacks than the 15.4% in the labor force in the community as a whole. An educational program is maintained by National Lead, and has been for many years, under which employees are refunded up to one hundred percent of the cost of any course taken to develop potential. In order to insure equality of blacks while maintaining operating efficiency, the company and Union operate under a system of bidding that enables all employees hired before March 14, 1963, to bid directly into any department. The hiring and promotional patterns, as well as the seniority system at National Lead, exemplify an active effort by that company to comply with the provisions of the 1964 Civil Rights Act. The evidence before this court fails to show any discriminatory activity on the part of National Lead since the enactment of Title VII of the Civil Rights Act of 1964.
For the reasons set forth above, plaintiff's request for a permanent injunction and for money damages is denied.
NOTES
[1] Plff's Exhibit 50. (None of the statistics used in Exhibits 50-53 include those who were hired for the summer months only.)
[2] These percentages were computed from Plaintiff's Exhibits 52 & 53. Since averages computed in those exhibits were erroneous in some instances, only the raw figures indicating the number hired in each category were used in the court's computation.
[3] National Lead has two plants in the metropolitan area of St. Louis. Only the hiring practices at the Titanium Division are involved in the present action.