479 F.2d 354
 5 Fair Empl.Prac.Cas. 823,
6 Fair Empl.Prac.Cas. 116,
5 Empl. Prac. Dec. P 8529,
5 Empl. Prac. Dec. P 8628
 UNITED STATES of America, Plaintiff-Appellant,
v.
N. L. INDUSTRIES, INC., and Chemical Workers' Basic Union,
Local 1744, AFLCIO, Defendants-Appellees.
 
 No. 72-1143.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1972.
Decided March 28, 1973.
Rehearing and Rehearings En Banc Denied May 21, 1973.
 Stuart P. Herman, Atty., Department of Justice, Washington, D. C., for plaintiff-appellant.
 Harry O. Moline, Jr., St. Louis, Mo., for Chemical Workers, etc.
 Howard Elliott, St. Louis, Mo., for National Lead Co.
 Before BRIGHT and STEPHENSON, Circuit Judges, and TALBOT SMITH, Senior District Judge.*
 BRIGHT, Circuit Judge.
 
 
 1
 This appeal by the United States brings before us for the second time an action brought by the Attorney General under the Civil Rights Act of 1964, Title VII, 42 U.S.C. Sec. 2000e et seq. to enjoin N. L. Industries (formerly National Lead Co., hereinafter the Company or National Lead) and Chemical Workers' Basic Union Local 1744, AFL-CIO (Local 1744), from discriminating against blacks who seek employment or are employed at the Company's St. Louis, Missouri, plant. The case came before us previously when the Government appealed the district court's denial of a preliminary injunction. United States v. National Lead Co., 438 F.2d 935 (8th Cir. 1971), aff'g, 315 F.Supp. 912 (E.D.Mo. 1970). In affirming the district court's denial of preliminary relief, we noted that evidence presented by the Government at that time raised an inference of discrimination, but we felt that a full scale trial on the merits would be beneficial in fashioning appropriate relief. The action has now been tried and the district court has completely rejected the Government's requests for relief.[1] After an exhaustive review of the complex and extensive trial records and exhibits, we reverse the district court and direct the entry of injunctive and other appropriate relief.[2]
 
 
 2
 The Company operates a plant in St. Louis known as the Titanium Pigment Division. This plant employs approximately 1100 production workers, including about 250 blacks. Local 1744 represents these production workers.
 
 
 3
 In this suit the Government makes the following charges of discrimination against the Company:
 
 
 4
 (1) The Company's departmental seniority system perpetuates the effects of past assignment of black employees to a racially segregated department and thus blacks hired prior to 1963 are denied an equal opportunity to compete with their contemporaries for the most desirable production jobs.
 
 
 5
 (2) The Company's assignment policies relating to new employees discriminates against blacks by assigning them in disproportionate numbers to the Labor department for seniority purposes.
 
 
 6
 (3) The Company discriminates against blacks in the selection of plant foremen.
 
 
 7
 (4) The Company engages in racially-discriminatory policies in its hiring of office, clerical, and technical personnel.
 
 
 8
 We turn to an examination of each of the Government's allegations.
 
 I.
 THE SENIORITY SYSTEM
 
 9
 Since the basic provisions of the Company's seniority system, as described in our earlier opinion, remain unchanged, we will repeat them here, with some amplification as provided by the completed record.
 
 
 10
 The collective bargaining agreement between the Company and Local 1744 creates a dual system of seniority, departmental and plantwide. Departmental seniority, based upon length of service in a particular department, governs bidding for vacant jobs within that department, choice of vacation schedule, order of layoff within a department and order of recall within that department after a layoff. Plantwide seniority, based upon length of service with the Company, determines such matters as success in interdepartmental bidding (where permitted), length of vacation, and insurance and annuity benefits.
 
 
 11
 For the purposes of departmental seniority, the production workers within the Local 1744 bargaining unit are divided into six departments: Acid, Water and Power, Stores, Mechanical, Titanium, and Labor. When a vacancy occurs within any department, the job is first open only to intradepartmental bids. There are no lines of progression within a department, and the employee with the greatest seniority within that department will attain the position if he bids for it; thus "leapfrogging" is permitted by this system.
 
 
 12
 If no bid is received from within a department, or if departmental bids leave a vacancy, employees from other departments may bid on the job and, under the 1972 bargaining agreement,[3] the job is then awarded to the bidder with the highest plantwide seniority.
 
 
 13
 When an employee changes departments, he cannot transfer his accumulated departmental seniority to the new department. The transferred employee is therefore junior in departmental seniority to those employees already working within the department, although the transferee may have considerably greater plantwide seniority. Thus, should a work force reduction occur within a department, the transferred employee will lose his position in his new department before any other employee possessing greater departmental seniority. Plantwide seniority, however, affords some protection to the employee who is thus "rolled-back" from his new department, because he is permitted to return to his former department where he takes whatever job is available until a desirable vacancy in that department occurs. He may then exercise his total departmental seniority, which includes that accrued in the new department prior to roll-back, to bid for that job.
 
 
 14
 Prior to mid-1962, the Company practiced employment discrimination by assigning blacks exclusively to the Labor department seniority group. With few exceptions, whites did not work in the Labor department prior to the effective date of Title VII, July 1, 1965. Until March, 1963, employees in the Labor seniority group were prohibited from transferring from the Labor department into any other department. The bargaining agreement was modified at that time to permit Labor department employees to bid into the Mechanical department, and after working there for one year, to bid on job vacancies in the three operating departments after intradepartmental bidding was exhausted. Employees in the other five departments already possessed this privilege of interdepartmental bidding, i. e., into the mechanical department and from it to another department.
 
 
 15
 In 1969, the collective bargaining agreement was again changed to permit an employee hired prior to March 14, 1963, to bid directly into one of the three operating departments (Acid, Water and Power, and Titanium), without first spending a year in the Mechanical department.[4] However, under the 1969 contract and under the present contract, bids from outside a department are permitted only after intradepartmental bidding is completed. Employees assigned to the Labor seniority group frequently assist in operations carried on in other departments such as Acid, Water and Power, and Titanium, but regardless of where they perform their work, they continue to accrue seniority only in the Labor group.
 
 
 16
 Numerous black employees with extensive Labor department seniority testified that the reason they had not bid into another department was because of the high risk involved since they are unable to carry Labor department seniority into the new department. This is especially true for the Labor department employee who has attained a desirable Labor department position because of seniority. If he bids into another department and then is bumped back into Labor, he does not return to his former job but instead becomes a "floater." As such he performs the least desirable jobs in the Labor department until he has had the opportunity to bid into another Labor department position.[5]
 
 
 17
 Thus the undisputed facts show (1) that prior to about July, 1962, National Lead assigned blacks to the Labor department only, which for all practical purposes was a segregated department, and (2) that the departmental seniority system inhibits blacks hired prior to March 14, 1963, from competing for desirable positions in the previously allwhite departments on an equal basis with white employees who have received a preference by being initially assigned to these departments. The statistics also reveal that many of the jobs in the Labor department carry a lower basic pay scale than many jobs in other departments.
 
 
 18
 The Company does not maintain job descriptions for each job classification within the plant. However, the evidence is undisputed that although black and white riggers and riggers' helpers use the same equipment, perform identical duties, and receive the same pay, the white riggers and their helpers accrue seniority in the Mechanical department while their black counterparts accrue seniority in the Labor department. Thus, under the present seniority system, a black rigger's helper desiring to bid on a rigger's job now held by a white would be permitted to make such a bid only after the job had been turned down by every employee in the Mechanical department. In 1967, the plant manager indicated that there was no reason why the riggers in the Labor department should not be transferred to the Mechanical department seniority list.
 
 
 19
 Under the collective bargaining agreement, an employee accepted for a new job shall have six days to qualify for the job, and if he fails to qualify, he may return to his old job without loss of seniority.
 
 
 20
 It is now beyond cavil that Title VII of the Civil Rights Act of 1964 proscribes employment practices and procedures which, although presently neutral and nondiscriminatory on their face, tend to preserve or continue the effects of past discriminatory practices. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. St. Louis-San Francisco Ry. Co., 464 F.2d 301 (8th Cir. 1972); Marquez v. Omaha District Sales Office, Ford Division, 440 F.2d 1157 (8th Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); United States v. I. B. E. W., Local 38, 428 F.2d 144 (6th Cir.), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970); United States v. Dillon Supply Co., 429 F.2d 800 (4th Cir. 1970); United States v. Sheet Metal Workers, Local 36, 416 F.2d 123 (8th Cir. 1969); Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); Local 53, Heat & Frost Insulators & Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E. D.Va.1968). In Griggs, supra, 401 U.S. at 429-430, 91 S.Ct. at 853, the Supreme Court said:
 
 
 21
 The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to "freeze" the status quo of prior discriminatory employment practices.
 
 
 22
 The Court further pointed out that, "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Id. at 431, 91 S.Ct. at 853. In a case which preceded Griggs, Judge Wisdom, writing for the Fifth Circuit, agreed with the proposition initiated in Quarles, supra, 279 F.Supp. at 516, that "it is * * * apparent that Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the act." Local 189, supra, 416 F.2d at 987-988.
 
 
 23
 Where an employment practice perpetuates the effects of past discriminatory procedures, the employer's good faith or absence of discriminatory purpose is immaterial. Griggs, supra, 401 U.S. at 432, 91 S.Ct. 849; St. Louis-San Francisco Ry. Co., supra, 464 F.2d at 307; Rowe v. General Motors Corp., 457 F.2d 348, 355 (5th Cir. 1972);[6] Marquez, supra, 440 F.2d at 1159-1160. "[G]ood intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability. * * * Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." Griggs, supra, 401 U.S. at 432, 91 S.Ct. at 854 (emphasis in original). "[W]here an employer's present advancement policy serves to perpetuate the effects of past discrimination, although neutral on its face, it rejuvenates the past discrimination in both fact and law regardless of present good faith." Marquez, supra, 440 F.2d at 1159-1160.
 
 
 24
 In the present case the district court found that prior to 1962 all Negro employees were assigned to the Labor department seniority group at National Lead and that prior to 1963, black employees could not transfer from that department to accrue seniority elsewhere. The court further found that these black employees hired prior to 1963 will thus "always be junior to employees hired contemporaneously with them who have remained in the department in which they were hired if Labor department employees transfer to that department." United States v. N. L. Industries, Inc., 338 F.Supp. 1167, 1169 (E.D.Mo.1972). These holdings are completely substantiated by the record.
 
 
 25
 Contrary to National Lead's contention, present contractual arrangements perpetuate the effects of past discriminatory practices and do not afford pre-1963 black employees an equal employment opportunity with white employees. Although a pre-1963 Labor department employee may bid into another department under certain circumstances, the conditions under which the right may be exercised are so onerous as to make the opportunity totally illusory. If a pre-1963 Labor department employee successfully bids on a job in another department, his Labor department seniority, accumulated in the only department where he was permitted to work, vanishes for all practical purposes within the new department. Thus, whether he has worked for the company for 20, 30, or more years, for the purposes of layoff or future bidding within his new department, he fares no better than the man right off the street contemporaneously hired into that department. In fact, if the man off the street were hired into the department one week or even one day before the pre-1963 employee who has 30 years of Labor department seniority, the new hire will be preferred over the pre-1963 employee in departmental bidding and layoff orders as well as in choice of vacation time. Thus, "The translation of racial status to jobseniority status cannot obscure the hard, cold fact that Negroes * * * will lose promotions which, but for their race they would surely have won. Every time a Negro worker hired under the old segregated system bids against a white worker in his job slot, the old racial classification reasserts itself, and the Negro suffers anew for his employer's previous bias." Local 189, supra, 416 F.2d at 988.
 
 
 26
 The testimony of Gordon Lockhart, a Labor department employee since 1947, pointedly illustrates the restrictive and illusory aspects of the right to transfer out of the Labor department under the Commpany's present plan:
 
 
 27
 * * * I was afraid to take the risk. You see, if I bid from the Labor Department to another department, then I'm a new man in that department, and then if I'm laid off that department, I will go back not to my present job that I left, but as a floater in the Yard Labor Department, therefore losing [sic] a cut in pay. I have six children. They are all in school, so you see, I have to watch those pennies.
 
 
 28
 Although the district court found that jobs in the Labor department were not the least desirable in the plant, support for that finding rested almost solely on testimony as to the subjective reactions of management personnel who had observed working conditions in the plant. The men who actually performed the tasks in the Labor department expressed a contrary point of view as to desirability. Moreover, the silence of the record in showing whites bidding into the Labor department is significant support for the Government's point of view as to desirability.
 
 
 29
 Traditionally, the classification of "laborer," whether rightfully or wrongfully, carries the connotation of being at the bottom of the job hierarchy. Moreover, given the realities of industrial life prior to the enactment of Title VII, we would be hard pressed to say that a company which assigned blacks only to the Labor department prior to 1962 was reserving its most desirable jobs for them.[7] In any case, the question here is not which jobs are most desirable as determined by subjective opinions, but whether previously discriminated against employees should have the opportunity to bid into jobs denied them because of skin color. See United States v. Hayes Int'l Corp., 456 F.2d 112, 118 (5th Cir. 1972).
 
 
 30
 The dual seniority system used at National Lead is very analogous to that described in Robinson, supra, 444 F.2d 791. There, as here, interdepartmental transfers were permitted if the employee were willing to forfeit seniority benefits accumulated in a former department and begin as a new employee in the department to which he had transferred. As here, the Lorillard employee who might be laid off in his new department because of low seniority also had the right to return to his old department and retain his original departmental seniority there. The court concluded that:
 
 
 31
 The record amply supports the findings of the District Court that Lorillard's departmental seniority system has a continuing discriminatory impact on the class represented by the plaintiffs. * * * [I]f all barriers to transfer were removed, under a departmental seniority system the plaintiffs will always suffer a real economic handicap in the better paying departments. As transferees they are treated as new hires for departmental seniority purposes, while white coworkers hired at the same time have departmental seniority coextensive with their total employment seniority. [Id. at 795-796.]
 
 
 32
 The seniority system involved in Bethlehem Steel, supra, 446 F.2d 652, permitted plant-wide transfer to lower level jobs remaining unfilled after intra-pool transfers[8] but, as here, without carryover of seniority or former rate of pay. The court found that the seniority and transfer provisions continued the effects of past discrimination, first, because the transferee had to forfeit seniority and pay levels earned in the black department and, second, because the transferee to a white department would never be able to reach the level of a white employee already there.[9]
 
 
 33
 Seniority transfer privileges in effect at the Bethlehem Steel Corporation plant at Sparrows Point, Maryland, which appeared less discriminatory than those present here, have recently been struck down by the Secretary of Labor as a violation of Executive Order 11246 prohibiting racial discrimination in employment by government contractors. In the Matter of Bethlehem Steel Corp., OFCC Docket No. 102-68, January 15, 1973. The seniority system conferred benefits of unit seniority as well as plant seniority-unit seniority determined promotion and demotion in lines of progression; plant seniority determined layoff and recall in seniority departments which covered several similar units in an area pool, and, finally, in the plant itself. The Secretary's determination reads in part:
 
 
 34
 Specifically, the Panel found that this system constituted present discrimination for two reasons:
 
 
 35
 (1) It discriminates against the blacks in [the] affected class who have previously transferred into formerly white units because they were required to relinquish employment seniority, and were placed at a disadvantage with respect to white employees hired into those units under the Company's former discriminatory hiring policy.
 
 
 36
 (2) It violates the Executive Order because blacks in the affected class, as a condition for a present exercise of a transfer right, are required to relinquish their existing unit seniority, take a pay cut, and compete with nondiscriminated employees in the new unit on the basis of unit rather than plant seniority.
 
 
 37
 Based on these findings, the Panel concluded, and I agree, that the Company is now in non-compliance with the obligations imposed upon it pursuant to its Government contracts under the Executive Order. [Id., slip opinion at 18-19 (footnote omitted).]
 
 
 38
 The above cited authorities lead us to the inescapable conclusion that the employment program followed at National Lead, although neutral on its face, violates Title VII. Close scrutiny reveals that all employees do not compete on an equal basis due to the lingering effects of pre-1963 discrimination. The price that the existing seniority plan extracts from the pre-1963 employees for the opportunity to break out of a department to which they were racially assigned is too high, especially since it is to be paid by the same group that has already endured the hardships of past discriminatory practices. Thus we find that although the present seniority plan is neutral on its face, it perpetuates the effects of past discriminatory employment procedures and cannot stand unless it is justified by essential business necessity.
 
 
 39
 The holding of the district court is somewhat ambiguous on this point. Although the court found that there was no evidence of discriminatory activity by National Lead since the enactment of Title VII, it apparently acknowledged the continuing effects of past discrimination, else it would not have found it necessary to rely on the business necessity doctrine to justify such effects. Similarly, the district court acknowledged substantial case law authority requiring some form of merger of seniority to overcome the continuing effects of past discrimination but sought to distinguish those cases on the basis that National Lead had a legitimate, nonracial business purpose for maintaining its present seniority system. It is therefore necessary to determine whether the business necessity doctrine supports the trial court's conclusion.
 
 
 40
 A seniority system that perpetuates the effects of past discrimination cannot be continued unless there is a showing of "compelling business necessity." St. Louis-San Francisco Ry. Co., supra, 464 F.2d at 308; see Griggs, supra, 401 U.S. at 431, 91 S.Ct. 849; Rowe, supra, 457 F.2d at 354; Local 189, supra, 416 F.2d at 989. In St. Louis-San Francisco Ry. Co., supra, 464 F.2d 301, 308, this Circuit, sitting en banc, stated that: "[T]his doctrine of business necessity, which has arisen as an exception to the amenability of discriminatory practices, 'connotes an irresistible demand.' The system in question must not only foster safety and efficiency, but must be essential to that goal." (Emphasis in original.)
 
 
 41
 [T]he business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential racial impact. [Robinson, supra, 444 F.2d at 798 (footnotes omitted).]
 
 
 42
 In Bethlehem Steel, supra, 446 F.2d at 662, the Second Circuit stated that "[T]he 'business necessity' doctrine must mean more than that transfer and seniority policies serve legitimate management functions. Otherwise, all but the most blatantly discriminatory plans would be excused even if they perpetuated the effects of past discrimination. Clearly such a result is not correct under Title VII."[10]
 
 
 43
 We emphasize that many of the company's arguments which were rejected in Bethlehem Steel are absent here because there are no lines of skill progression and there is not even a contention that changing the seniority system will increase the likelihood of injury.
 
 
 44
 The Secretary of Labor has followed the lead of the Second Circuit in ordering relief for black employees who had been assigned to predominately black departments at the Sparrows Point, Maryland, Bethlehem Steel Corporation facility. In the Matter of Bethlehem Steel Corporation, supra, OFCC Docket 102-68. The Secretary, in rejecting the argument that safety and plant efficiency would suffer by permitting advancement within a unit on the basis of plant service (seniority) aptly noted:
 
 
 45
 [T]o say that a man is most experienced by virtue of his work in a given unit is not always true. Indeed, one's ability need never be examined only assumed under a system of promoting on the basis of unit seniority only. [Id., slip opinion at 34.]
 
 
 46
 Here, the district court failed to apply the appropriate underlying principles in holding that the Company's seniority program was justified by business necessity. First, we note the district court spoke in terms of "business purpose," an incorrect test, rather than in terms of "compelling business necessity," the test prescribed in St. Louis-San Francisco Ry., supra, 464 F.2d 301. Business purpose alone is not enough to justify an employment practice which preserves the effects of past discrimination. Robinson, supra, 444 F.2d at 796-798. Second, we find no evidence indicating that the ends of safety are promoted by the present seniority system. Third, the question of efficiency was only tangentially raised by testimony of the plant manager who indicated that the failure of a Titanium operator to perform his duties properly could cause considerable waste. There was, however, no testimony that a person of ordinary intelligence, who was given the six-day training period prerequisite to becoming an operator, would be unable to perform that job satisfactorily.
 
 
 47
 In regard to the alleged need for prior experience within a department, we again point out that National Lead maintains no lines of progression within departments or between departments. The sole determinatnt for job selection is seniority and only seniority-not ability. Thus, as in St. Louis-San Francisco Ry., supra, 464 F.2d at 309, "Length of service becomes synonymous with qualified." The only further prerequisite for qualification rests on the transferee's ability to perform the job after a six-day training period. Here, as in Robinson, supra, 444 F.2d at 799, "[T]he record is barren of any real evidence that the jobs in the formerly all-white departments are so complex and interrelated that progression through a series of jobs is necessary to efficient performance of the more difficult tasks," and even if such a showing had been made, "[I]t is difficult to imagine how even the necessity for job progression could constitute the business necessity which would justify a departmental seniority system that perpetuated the effects of prior discriminatory practices."
 
 
 48
 In considering business necessity, the district court gave some weight to the alleged training costs which, according to the Company, flow from interdepartmental transfers due to an average of three job moves attributable to filling a single departmental vacancy. In light of the 1972 collective bargaining agreement, which freely permits interdepartmental transfers after intradepartmental bidding is completed, and in light of our proposed remedy, which does not alter interdepartmental bidding procedures, we do not believe that the alleged excessive costs in changing the seniority system can be substantiated. However, assuming arguendo that the proposed remedy will entail some additional costs, we adhere to the Fourth Circuit's view that, "[A]voidance of the expense of changing employment practices is not a business purpose that will validate the racially differential effects of an otherwise unlawful employment practice." Robinson, supra, 444 F.2d at 800. See Bing v. Roadway Express, Inc., 444 F.2d 687, 690 (5th Cir. 1971).[11] Additionally, we note that in St. Louis-San Francisco Ry., supra, 464 F.2d at 310, we required the employer to create and implement an extensive retraining program by which train porters could become qualified as brakemen. No such retraining is necessary here. In fact we do not perceive the necessity for any change in National Lead's current training program.
 
 
 49
 We thus conclude that the present seniority system at National Lead does not meet the requirements of the compelling business necessity test.
 
 II.
 POST-ACT DISCRIMINATION
 
 50
 We now turn to the contention that National Lead continues to practice racial discrimination by assigning a disproportionate percentage of blacks to the Labor department seniority group while whites appear to enjoy a preference in assignments to other departments in the plant. The evidence indicates that between the effective date of the Civil Rights Act, July 1, 1965, and August 11, 1970, National Lead assigned approximately 50 percent of its new black hires to the labor department seniority group. Approximately 31 percent of new white hires were assigned to the Labor department seniority group during this same period. As of November, 1969, the Labor department remained almost 90 percent black while the percentage of blacks in all other departments was less than five percent. The result has been that the work force remains largely segregated while these statistics are indicative of the lack of effectiveness of National Lead's efforts to eliminate its segregated departments, we cannot say on this record that they are conclusive on the issue of continuing discrimination. They will, however, be considered in formulating an appropriate remedy.
 
 
 51
 In regard to the Company's practice of assigning black riggers to one seniority group while assigning white riggers to another despite the fact that they perform identical tasks, we hold that such a practice is not only the perpetuation of past discrimination, but is in itself a presently discriminatory practice, regardless of past procedures.
 
 III.
 SELECTION OF FOREMEN
 
 52
 The record indicates that individuals are promoted to the position of foreman on the basis of recommendations by incumbent foremen.[12] Final selection is made by the general superintendent. The education requirements are minimal, and some individuals with only eighth grade education have been promoted.
 
 
 53
 Of the approximately 100 foremen in the plant who supervise the work of the employees in the Local 1744 bargaining unit, only three are black, and all three have been assigned to supervise Labor department employees exclusively. In the history of the Company, no other blacks have been appointed as foremen over this bargaining unit, and only one other black has ever been appointed to a foreman position in another bargaining unit.
 
 
 54
 In January of 1967, National Lead prepared a list of 32 black employees whom it considered capable of qualifyin as foremen after a reasonable period of training. All of the employees on the list are experienced and have ten or more years of education, including three possessing at least two years of college. None of the blacks on the list have ever been promoted to the foreman position, although approximately 26 white employees, some with less education than the blacks on the list, have been promoted since the list was prepared. The record establishes, at least to the extent of the evidence before us, that these black men possess objective qualifications equal or superior to those possessed by some whites who have been promoted.
 
 
 55
 The trial court rejected the claim of discrimination relating to foremen, finding the statistical data unpersuasive. The court made reference to an educational program funded by the Company as relevant to developing potential for job advancement, but there was no evidence that white employees were required to participate in the program before being promoted.
 
 
 56
 The statistical data leaves the strong inference that racial considerations have dictated the choice of foremen. This Circuit has repeatedly held that discrimination may be established by statistical data. See, e. g., St. Louis-San Francisco Ry., supra, 464 F. 2d at 307; Carter v. Gallagher, 452 F.2d 315, 323 (8th Cir. 1971), modified on rehearing en banc, 452 F.2d at 327, cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed. 338 (1972); Marquez, supra, 440 F.2d at 1160-1161; Parham, supra, 433 F.2d at 426. Other circuits are in accord. See, e. g., United States v. Wood Lathers, Local 46, 471 F.2d 408, 414 n. 11 (2d Cir. 1973); United States v. Chesapeake and Ohio Ry. Co., 471 F.2d 582, 586 (4th Cir. 1972); Rowe, supra, 457 F.2d at 357 (5th Cir.); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 at 247 (10th Cir. 1970). In St. Louis-San Francisco Ry., supra, 464 F.2d at 307, we held that "Although the record does not contain specific evidence of the refusal of Frisco to hire blacks during this period * * * these statistics demonstrate just as effectively as the testimony of a witness that Frisco and the BRT systematically excluded blacks in hiring new brakemen."
 
 
 57
 The inference of discrimination provided by the statistics is reinforced by the Company's method of selecting foremen. The Company's promotional plan is very similar to that used by General Motors Corporation in Rowe, supra, 457 F.2d 348. In that plan the foreman's recommendation was the indispensable, single most important element in the promotional process; there were no written instructions to foremen as to the qualifications desired; standards that were set were vague and subjective; hourly employees were not notified of promotional opportunities; and there were no safeguards in the procedure to prevent discrimination.
 
 
 58
 In concluding that such procedures were violative of Title VII, the court commented:
 
 
 59
 Blacks may very well have been hindered in obtaining recommendations from their foremen since there is no familial or social association between these two groups. All we do today is recognize that promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action. [Id. at 359 (footnote omitted).]
 
 
 60
 The method by which the company acquired new employees in Parham, supra, 433 F.2d 421, is also similar to the Company's method of acquiring new foremen here. In Parham employment depended primarily upon being referred to the company by an existing employee. We pointed out that "With an almost completely white work force, it is hardly surprising that such a system of recruitment produced few, if any, black applicants," and we determined that such a system of recruiting new workers operated to discriminate against blacks. Id. at 427.
 
 
 61
 We think evidence indicating that out of about 100 foremen only three are black, that these three black foremen are in charge of only Labor department employees, that a black foreman has never been in charge of white employees in this bargaining unit, that one of 36 employees promoted to foreman since 1965 was black, that a pool of qualified black employees exists, and that white employees with less qualifications have been promoted to foreman positions presents a prima facie case of racial discrimination that has not been rebutted by the Company. See Carter, supra, 452 F.2d at 323; Parham, supra, 433 F.2d at 426; Jones, supra, 431 F.2d at 247.
 
 
 62
 In Marquez, supra, 440 F.2d at 1162, this court observed that, "Documentary evidence relating to an employee's nonpromotional status serves to corroborate a claim of racial discrimination. This evidence becomes particularly significant when no rational reason is offered to rebut the telling inference otherwise established."
 
 
 63
 Upon analysis, none of the Company's contentions serve to explain its failure to promote qualified blacks to foreman positions, nor its failure to assign the few it has promoted to a department other than Labor. National Lead's contention that the reason black employees were not promoted to supervisory positions was because they did not "ask" to be promoted is without merit. Nothing in the record indicates that white employees were required to make such a request. In any case, a black employee with knowledge of the nominal number of black foremen, the Company's past discriminatory policies, and the current practice of promotion via the recommendation of an incumbent foreman could hardly be expected to make a meaningless request indicating his willingness to be promoted. Sheet Metal Workers, supra, 416 F.2d at 132; Carter, supra, 452 F.2d at 331; see Parham, supra, 433 F. 2d at 427.
 
 IV.
 
 64
 OFFICE AND CLERICAL WORKERS AND LABORATORY PERSONNEL
 
 
 65
 The Government attempts to prove discrimination in the Company's hiring of clerical and technical employees in two ways: (1) by statistical evidence showing an allegedly unexplained and unjustifiable disparity in the ratio of black to white employees; and (2) by concrete evidence that the Company failed to hire certain allegedly qualified individuals because they were black.
 
 
 66
 By way of statistical data, the evidence introduced by the Government indicated that in 1965 National Lead employed 59 office and clerical workers, one of whom was black. At the time of this suit, the Company had 48 office, clerical, and secretarial personnel, two of whom were black. Of the 31 new office and clerical personnel hired between January, 1965, and the time of this suit, only one was black.
 
 
 67
 The Company employed 28 laboratory technicians and assistants in November, 1969, of whom one was black. A total of approximately 10 blacks have been employed in the lab at various times from 1963 to the present. At least two black applicants have unsuccessfully sought positions as laboratory technicians or assistants since 1965. One of these positions was filled by a black applicant.
 
 
 68
 Initially, we note that although the Government contends that the statistical evidence, buttressed by testimony of individual applicants, makes out a prima facie case of racial discrimination, it also argues that it was denied complete discovery of National Lead's clerical and technical application and employment records and that such a denial by the district court is inconsistent with its holding that the Government had failed to prove discrimination.[13]
 
 
 69
 The record reveals that the Government was limited in its discovery efforts and in its efforts to have certain evidence concerning clerical and technical employees admitted at trial. Apparently the district court's reason for imposing limitations in this area was due to its belief that the union which represents the clerical employees was a necessary party under Rule 19, Fed.R.Civ.P. However, it is undisputed that National Lead has complete and absolute discretion in the initial hiring of clerical employees and the union has no discretion whatever in this area. Additionally, the Government asserts that there would be no change whatever in the union-company contract, even if the Government obtained the relief it seeks. Under these circumstances, until a showing is made that the requested relief in any way affects the union-company agreement, we do not perceive any necessity for joining the union. See Sheet Metal Workers, supra, 416 F.2d at 132 n.16; Norman v. Missouri Pacific Railroad, 414 F.2d 73, 84-85 (8th Cir. 1969).
 
 
 70
 We believe the district court unduly restricted discovery here. Thus, if any limitation upon discovery or admission of evidence worked to the serious prejudice of the Government's case, a remand for further hearings would be necessary. However, we think the evidence that was presented on this point is adequate to determine whether the Company's hiring policies in regard to clerical and technical workers was discriminatory.
 
 
 71
 The statistics themselves reflect evidence of discrimination, and "In racial discrimination cases, statistics often demonstrate more than the testimony of many witnesses, and they should be given proper effect by the courts." Jones, supra, 431 F.2d at 247. In the present case, we think the district court gave inadequate weight to the statistical evidence. In Hayes, supra, 456 F.2d 112, the district court had found that there was no evidence in the record to support the inference of discrimination indicated by the high ratio of whites to blacks in the office and technical departments. The court stated:
 
 
 72
 These lopsided ratios are not conclusive proof of past or present discriminatory hiring practices; however, they do present a prima facie case. The onus of going forward with the evidence and the burden of persuasion is thus on Hayes. * * *
 
 
 73
 * * * The inference arises from the statistics themselves and no other evidence is required to support the inference. [Id. at 120.]
 
 
 74
 Although the company in Hayes presented some evidence tending to rebut the inference of discrimination, the court held such evidence, similar to that presented by the Company here, inadequate:
 
 
 75
 This burden is not met by Hayes' attempts to parry specific allegations of alleged discrimination, e. g., the four negroes rejected after failing a typing test and the one turned away for being overweight, or by company officials stating in general terms that no one was refused employment solely because of their race. [Id. at 120.]
 
 
 76
 See Bing, supra, 444 F.2d at 689; Jones, supra, 431 F.2d at 247.
 
 
 77
 The evidence before us presents statistics reflecting great disparity in the employment of blacks as compared to whites as clerks, typists, and technicians. The Company apparently maintained a white-only policy in these departments prior to the effective date of the Civil Rights Act, and we note that, since the Act, the Company's efforts to increase the number of blacks in these job classifications have been minimal or nonexistent, and in any case unsuccessful. We think the statistics, when considered in the light of the Company's past discriminatory policies and its failure to fully ameliorate those policies, establishes an inference of discrimination which the Company has failed to rebut by its assertion of nondiscriminatory hiring policies. Hayes, supra, 456 F.2d at 120; Jones, supra, 431 F.2d at 247.
 
 V.
 DISCRIMINATION AGAINST SPECIFIC INDIVIDUALS
 
 78
 We next examine the Government's contention that National Lead discriminated against specific individuals who applied for clerical or technical jobs but were not hired. In the present case, as of course in all employment discrimination cases, the employer contends that the individual black applicants were not hired because they were not qualified. In light of the extremely nominal percentage of black employees within the clerical and technical departments, such an allegation must be given close scrutiny. We, of course, do not require that an employer hire an applicant who does not possess the basic skills essential to the performance of a particular job, regardless of the color of his skin, but, discrimination, or conversely, fairness, in general hiring practices often indicates whether an employer is discriminating against individual applicants for employment. Parham, supra, 433 F.2d at 425. However, we also indicated in Parham that although a company's general discriminatory practices furnished a strong inference that a particular applicant was rejected because of racial considerations, such a presumption is not conclusive. Id. at 428.
 
 
 79
 The Government argues that at least three qualified black applicants for clerical positions and two for laboratory technician assistants were refused employment on the basis of race. The district court ruled that these applicants had failed to prove a racially-motivated basis for not being hired. In denying relief to the three clerical applicants, the court relied on its earlier opinion, 315 F.Supp. 912 (E.D.Mo.1970), in which it discussed the applicants individually. There the court found that Doris Cobb and Lillian Mitchell were justifiably denied positions because of their failure to prove that they had passed homemade tests given them by the Company and their failure to show that the tests were not job oriented, or that they were racially discriminatory. The test given to Cobb consisted of four or five mathematical problems which a Company employee jotted down on a sheet of yellow paper. She was denied the use of a comptometer in taking the test. The test given to Mitchell was improvised by the Company employment supervisor and consisted of approximately five minutes of dictation from a foreman's manual which the supervisor "ordinarily" dictated at 80 words per minute.
 
 
 80
 These tests do not constitute an acceptable employment test under Title VII of the Act. The Act specifically permits the use of a test under certain circumstances. It states that it is not an unlawful employment practice for an employer "to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin." 42 U. S.C. Sec. 2000e-2(h) (emphasis added). The Company has failed to offer any evidence that the above-mentioned homemade tests were "professionally developed ability test[s]." In Griggs, supra, 401 U.S. 424, 431-432, 91 S.Ct. 849, the Supreme Court indicated that when a test is shown to exclude Negroes, it is the duty of the employer to establish that the test has a demonstrable relationship to successful job performance, rather than the duty of the complainant to show that the test does not have such a relationship. See Rowe, supra, 457 F. 2d at 355 n. 14.
 
 
 81
 Under the circumstances of this case, the validity of these homemade tests is especially suspect. Miss Cobb, who was applying for a position as an accounting clerk, had four years of experience in that capacity at Standard Oil and six months with another company. She had taken several standardized accounting clerk examinations without failing any of them. She further testified that none of the standardized tests were similar to the one given by National Lead, nor had she ever been denied the use of an adding machine or comptometer in taking the exam. In any case, the Company failed to introduce evidence that Cobb had actually failed the test given her or that the person hired possessed superior qualifications.
 
 
 82
 Mitchell, whose resume indicated exceptional qualifications, had four years experience as an executive secretary at Anheuser-Busch before applying at National Lead. She had two years of college and one year of business school, and at the time of her application to the Company, she was teaching clerical subjects at adult education night classes. She testified that she could type between 70 and 75 words a minute and take shorthand at 90 to 100 words per minute.
 
 
 83
 The Company has established no basis for its failure to hire Cobb and relies only on Mitchell's performance on a homemade dictation test from the foreman's manual as the reason for rejecting her application.
 
 
 84
 A test may provide a convenient and superficially neutral means by which employers can disguise their biases or their desire to conform to the biases of workers and customers and thus evade Title VII obligations. Developments-Title VII, supra, 84 Harv.L.Rev. at 1123. The homemade tests administered by the Company certainly permit vast fluctuation in both their content and administration. It hardly requires the expertise of a psychometrist to perceive that the difficulty of the problems given to Cobb or the speed of the dictation given to Mitchell are within the complete subjective control of the individual examiner. In addition, National Lead has not shown that the examiner possessed any expertise in testing, that the test was in any way standardized, nor even that the hired applicants performed more satisfactorily than these rejected black applicants.
 
 
 85
 Our prior decisions make clear that, in cases presenting questions of discriminatory hiring practices, employment decisions based on subjective, rather than objective, criteria carry little weight in rebutting charges of discrimination. See Moore v. Board of Education of Chidester School District No. 59, Ark., 448 F.2d 709 (8th Cir. 1971). See also Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971). * * * In enacting Title VII, Congress has mandated the removal of racial barriers to employment. Judicial acceptance of subjectively based hiring decisions must be limited if Title VII is to be more than an illusory commitment to that end, for subjective criteria may mask aspects of prohibited prejudice. Employers seldom admit racial discrimination. [Green, supra, 463 F.2d at 343.]
 
 
 86
 Through the testimony of the individual applicants supported by the foregoing statistical evidence, the Government has established a prima facie case of discrimination which the Company has failed to rebut, and Cobb and Mitchell are therefore entitled to limited relief under Title VII.
 
 
 87
 Barbara Martin sought a job with National Lead as a keypunch operator in response to a job order placed with the Missouri State Employment Service (Missouri Employment) by the Company. The job order as originally placed specifically listed a one-year experience requirement. When Martin applied for the job, she informed the National Lead interviewer that she had four years and two months work experience as a keypunch operator. The Company official then informed her that the job required five years experience and denied her request to demonstrate her ability on the keypunch machine. Five days thereafter, National Lead changed the job order at Missouri Employment to specify a five-year experience requirement. The Company's supervisor stated that he could not recall Miss Martin's application, nor could he recall whether he had permitted her to try out for the job. Although he stated that the experience requirement for keypunch operators was five years, he offered no evidence that other keypunch operators employed at National Lead had five years experience, and he admitted that some employees who were promoted to keypunch operator from within the Company did not meet that requirement.
 
 
 88
 We find the circumstances under which Miss Martin was denied a job unusual to say the least. The Company might easily have affirmatively established a definite and enforced five-year work-experience requirement for keypunch operators by documentary evidence such as employment records of other personnel hired for that position or by testimony from employees that they had met such a requirement before being hired to that position. National Lead has failed to do either. Under these circumstances, the Company has failed to rebut the Government's evidence of discriminatory hiring in its denial of a position to Martin.
 
 
 89
 We note that in its brief the Company attempts to rebut the Government's contention that it discriminated in refusing Martin employment by asserting that the employee who was hired to fill the position, one Becton, was black. That contention is not supported by the record. The evidence indicates that Becton was not employed until September of 1969, eight months after the keypunch position was filled, and she was apparently the only black hired as an office, clerical, or secretarial employee since 1963.
 
 
 90
 Mrs. Ragland applied for a job as lab assistant at National Lead in 1966. At the Company's request, she took a standardized test administered by Missouri Employment. Ragland testified that she did not know whether she had passed the test, but the Company did not offer her the position. She again applied for the position in 1967 when informed of an opening by one Harold Crumpton, a Chief Shift Chemist at National Lead. She was told at that time that there were no openings. We think that the record reveals Ragland's testimony to be at best inconclusive and confusing and fails to establish that she possessed even minimal qualifications for the position. We, therefore, deny relief.
 
 
 91
 Thelma Wiley applied for the job of lab assistant in 1968. She had completed high school and had taken courses in chemistry and physics. She also had courses in physics, chemistry, and quantitative analysis while in college. She was not hired, nor was she again contacted by the Company.
 
 
 92
 To rebut this charge of discrimination in hiring, National Lead's employee relationship manager testified that this particular position had been filled by another black applicant. The district court held that under these circumstances race was not a factor in the Company's failure to select Wiley for the position. We agree.
 
 
 93
 The district court also concluded that four black applicants for production work were not discriminated against by the Company's failure to hire them since no openings were available at the time of their applications. We find nothing in the record to warrant a finding of discrimination and thus agree with the district court's holding.
 
 VI.
 REMEDY
 PRODUCTION WORKERS
 
 94
 As to production workers, the Government requests (1) that all employees with Labor department seniority, whenever hired, be merged into the departments where they perform their work and be permitted to retain plantwide seniority, and (2) that blacks assigned to the Labor department be permitted one successful interdepartmental transfer into traditionally-white departments without loss of rate of pay and with carryover of plantwide seniority.
 
 
 95
 As to foremen, the Government requests that blacks listed by the Company in 1967 as possessing foreman qualifications be given preference in the selection of foremen until at least 15 of them have been selected. In its proposed decree, the Government also requests that one-half of all additional foreman vacancies be filled by black employees if there are qualified blacks available. As to clerical and technical personnel, the Government would require that the five black women who have testified in this case be offered preference for future vacancies in clerical and laboratory positions and be awarded backpay. The Government also asks that National Lead be required to produce an affirmative program leading to the employment of blacks to the extent of one of every three applicants in clerical, secretarial, and laboratory openings.
 
 
 96
 We turn to the standards governing relief, first in regard to the black production workers hired prior to March 14, 1963, who clearly continue to suffer the effects of past discrimination.
 
 
 97
 Although in granting relief for Title VII violations, the courts possess wide discretion to model decrees which insure compliance with the Act, Parham, supra, 433 F.2d at 428; St. Louis-San Francisco Ry., supra, 464 F.2d at 309, they face a continuing dilemma in determining how far the employer must go to undo the effects of past discrimination. Local 189, supra, 416 F.2d at 988. The three theories that have been advanced[14] are appropriately summarized by Judge Wilson in Local 189:
 
 
 98
 A complete purge of the "but-for" effects of previous bias would require that Negroes displace white incumbents who hold jobs that, but for discrimination, the Negroes' greater mill seniority would entitle them to hold. Under this "freedom now" theory, allowing junior whites to continue in their jobs constitutes and [sic] act of discrimination.
 
 
 99
 Crown and Local 189 advance a "status quo" theory: the employer may satisfy the requirements of the Act merely by ending explicit racial discrimination. Under that theory, whatever unfortunate effects there might be in future bidding by Negroes luckless enough to have been hired before desegregation would be considered merely as an incident of now extinguished discrimination.
 
 
 100
 A "rightful place" theory stands between a complete purge of "but-for" effects [and] maintenance of the status quo. The Act should be construed to prohibit the future awarding of vacant jobs on the basis of a seniority system that "locks in" prior racial classification. White incumbent workers should not be bumped out of their present positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings. This solution accords with the purpose and history of the legislation. [Id. at 988 (footnotes omitted).]
 
 
 101
 In fashioning a remedy whereby black employees locked into the Labor department may transfer into the formerly all-white departments to acquire their rightful place, we must observe from this record the aptness and relevance of the court's holding in Bethlehem Steel, supra, 446 F.2d at 659:
 
 
 102
 If discriminatorily assigned employees cannot keep in their new jobs their former rate of pay and seniority, few will transfer and those that do will suffer an economic penalty and be forever behind their white contemporaries.
 
 
 103
 In Bethlehem Steel the district court had failed to grant seniority carryover and rate retention, largely because Bethlehem's seniority system was not a complete deterrent to transfer. The court of appeals reasoned:
 
 
 104
 [T]his puts it backwards. Even a discriminatory system that did not completely deter transfers but only discouraged them should be changed. The correct criterion in fashioning a remedy under Title VII is what would be necessary to insure sufficient incentive to transfer so that the effects of past discrimination would not be perpetuated. In addition, the test here must also look to advancement after transfer, so that an employee can achieve his "rightful place." That is, relief under the Act should give discriminated employees, as future vacancies arise, the opportunity to obtain the jobs that they would have earned had there been no discrimination. [Id. at 660.].[15]
 
 
 105
 In Robinson, supra, 444 F.2d at 795, the court approved the following relief granted by the district court:
 
 
 106
 (1) modification of the transfer restrictions to permit employees to transfer to a different department to fill vacancies which may occur and, after a residency period of thirty days in the new department, to exercise their full employment seniority for all purposes, (2) adoption of "red circling" to allow a transferring employee to continue his old wage rate in effect until rising in his new department to a position paying an equal or greater wage rate, and (3) payment of back pay to members of the affected class.[16]
 
 
 107
 On the record presented here, we think a remedy similar to the remedies granted in Robinson and in Bethlehem Steel is justified and appropriate.[17] Accordingly, on remand we direct that the district court enter an injunctive decree which embraces the following specific guidelines for the affected class. The affected class shall be defined as all employees who were hired prior to March 14, 1963, and were initially assigned to the Labor department seniority group, including those on layoff status.
 
 A. Bidding Procedure
 
 108
 (1) Any member of the affected class who successfully bids into another department from the Labor department shall be permitted to retain his plantwide seniority for all purposes within that department. This carryover of plantwide seniority shall be permitted for only one interdepartmental transfer.
 
 
 109
 (2) Members of the affected class who have already transferred out of the Labor department into another department shall be similarly entitled to add their previously earned Labor department seniority to their present departmental seniority.
 
 
 110
 (3) If after a successful interdepartmental transfer, a member of the affected class is bumped back into Labor, carryover of plant seniority privileges will continue to apply if he reacquires a position in the department from which he was bumped. There will be no seniority carryover if he bids into a third department.
 
 
 111
 (4) In intradepartmental bidding between members of the affected class and whites who, similarly to the affected class, were employed prior to March 14, 1963, plant seniority shall be applied to determine bidding preference between or among such competing black and white applicants.
 
 B. Rate Retention
 
 112
 (1) A member of the affected class who successfully bids into a new department shall not be paid at a lower hourly rate than that which he received on the job from which he transferred (excluding shift and incentive bonuses except where appropriate), until he has had an opportunity to bid and qualify for a position which pays at least the rate of his former Labor department job. These wage rate retention provisions should apply, as appropriate, to those employees in the affected class who have already transferred from the Labor department but are paid a lower hourly rate than on their former Labor department jobs.
 
 
 113
 (2) If an affected employee, after a reasonable period of time in which to become familiar with operations in his new department, (a) fails to bid upon a department vacancy entitling him to at least the equivalent pay rate as that earned in the Labor department, or (b) upon successfully bidding, fails to qualify for the new job after receiving a fair, proper, and effective course of training within the time period specified in the current labor contract, then such employee may retain his departmental position at the prescribed pay scale or retransfer to the Labor Department, carrying with him all seniority accrued in the Labor department and the seniority added while in the new department. Except as otherwise provided in the injunctive order, the provisions of the collective bargaining agreement between appellees shall govern the rights of employees.[18]
 
 
 114
 We have declined the Government's invitation to abolish departmental seniority by substituting plantwide bidding for intradepartmental bidding. Although National Lead does not require employees to enter a line of progression in a department or in units of a department as a basis for bidding on departmental vacancies, we are not convinced that the scheme of departmental bidding, which allows employees already working within a department to bid before permitting an interdepartmental bid, does not serve a useful familiarization function for the transferring employee. This arrangement, we proposed, represents a compromise between the obligation of the employer to assure a rightful place for those employees who continue to suffer from racial prejudice in their employment and the need for the disadvantaged employee to obtain useful familiarity within a department before he has the opportunity to bid a position previously denied him because of race.
 
 
 115
 With one exception, we at this time decline the Government's request to direct a merger of the seniority of the Labor department employees into the seniority of the departments where they perform a substantial portion of their work. The proposal presents commendable features, particularly that of integrating black workers into almost all-white departments, but we are not convinced on this record that functional similarity of jobs may be equated with proximity of work. However, in the case of the black and white riggers and riggers' helpers who undisputedly perform identical tasks while assigned to different departments on a racial basis, we direct that the Labor department riggers and riggers' helpers be merged into the Mechanical department with full seniority carryover.
 
 
 116
 We believe that other merger considerations should be delayed until the Company and its employees adjust to changes in job positions brought about by pre-1963 employees carrying over Labor department seniority into other departments. Since the trial court will continue to exercise jurisdiction over this case, the merger remedy should be reconsidered in two years, or earlier, at the discretion of the district court.
 
 FOREMEN
 
 117
 We turn to the Government's request that in the selection of foremen first consideration be given to those blacks who were placed on the qualified list by National Lead in 1967 until at least 15 of them have been selected. In its proposed decree, the Government not only requests that the first 15 vacancies be filled from the list, but also that one-half of all additional foreman vacancies beyond those 15 be filled by black employees if there are qualified black employees available.
 
 
 118
 In Carter, supra, 452 F.2d 315, this court, sitting en banc, extensively discussed appropriate remedies for discriminatory practices. We stated that, although we acknowledge the legitimacy of erasing the effects of past racially discriminatory practices, an absolute preference for qualified minority persons would operate as an infringement on those nonminority group persons who are equally or better qualified for the position in question. Id. at 330. We concluded that to accommodate these conflicting considerations, a reasonable hiring ratio between minority and nonminority persons, rather than an absolute hiring preference, would more appropriately assure minority persons fair representation in a particular position and presently eliminate the effects of past discriminatory practice. We adhere to that view here in denying an absolute hiring preference to members on the 1967 list. In addition, we will not confine the Company's promotional choices to members of a list prepared six years ago. However, in determining an appropriate minority-nonminority hiring ratio, we think that the number of qualified blacks available is an important factor and the evidence indicates that a substantial number of blacks already working in the plant possess the necessary qualifications for promotion to supervisory positions. Thus, we conclude that a one-black-to-one-white ratio is appropriate here until 15 blacks have been promoted to front line foreman positions. We do not think that 15 black foremen out of 100 is an unreasonable initial goal in light of the fact that blacks represent approximately 25 percent of the Company's production workers. As we stated in Carter, supra, 452 F.2d at 330-331, this procedure does not constitute a quota system, because upon complete implementation of this order, all future promotions will be on a nondiscriminatory basis and the racial composition of a job classification may contain a percentage of blacks which may be more or less than the percentage of blacks in the other areas of the plant or in the community at large.
 
 
 119
 The strong deterrent to the selection of black foreman, in part, comes from the selection procedures used by the Company. Thus we further direct that the district court order a revision of the selection system for foremen which meets these requirements:
 
 
 120
 (1) The Company shall promulgate in writing and publish throughout the plant reasonably objective standards for its selection of foremen.
 
 
 121
 (2) The Company shall develop a roster of plant personnel eligible for promotion to foreman.
 
 
 122
 (3) All plant personnel who deem themselves qualified shall be entitled to submit an application for this roster.
 
 
 123
 (4) The Company shall evaluate and rate candidates for the position of foreman without regard to race and upon reasonably objective standards.
 
 
 124
 (5) Foremen shall be selected without regard to their race and without regard to whether predominantly black or predominantly white crews are to be supervised.
 
 
 125
 (6) Those black employees previously listed as possessing potential as foremen shall be entitled to be placed upon the foreman's roster if they meet the appropriate standards.
 
 
 126
 (7) Foremen must be selected on the basis of merit as judged by reasonably objective written standards.CLERICAL, SECRETARIAL, AND LABORATORY PERSONNEL
 
 
 127
 The Government requests specific relief for individual applicants, including backpay differentials, plus an advertising and recruiting campaign designed to produce a minimum of onethird black hires in the near future. We believe goals to be desirable, but as we have noted in Carter, supra, 452 F.2d 315, if goals in effect become fixed quotas, such method will not always serve to provide equality of employment for blacks and whites. Accordingly, the district court shall enter an order relating to clerical, secretarial, and laboratory personnel comformable to these standards:
 
 
 128
 (1) The Company shall promulgate job descriptions and qualifications for clerical, secretarial, and laboratory personnel.
 
 
 129
 (2) It shall list qualifications on job orders submitted to employment agencies for these vacancies.
 
 
 130
 (3) When seeking to fill vacancies, the Company shall circularize job orders to appropriate employment services to ensure equal notice to potential black and white applicants.[19]
 
 
 131
 (4) Job vacancies shall be filed on the basis of qualifications as evaluated under reasonably objective criteria.
 
 
 132
 (5) To ensure equal consideration of black applicants, the Company shall record the reasons for its choice in filling a vacancy and for rejecting any applicant and shall notify the referring agency of its reasons for rejection.
 
 
 133
 (6) The following applicants-Barbara Martin, Doris Cobb, and Lillian Mitchell-shall be placed on a preferred list for jobs for which they have previously applied and given the right of first refusal for any vacancy for which their previous or a revised application may show them qualified.
 
 
 134
 In order to assure proper compliance with the standards herein enunciated, which shall be incorporated into an injunction, we direct that the injunction contain provisions requiring National Lead to make data available to the Government to permit its effective monitoring of the Company's performance of its obligations under Title VII. We specifically require that the Company submit certain reports requested by the Government as indicated by the Appendix to this opinion.
 
 
 135
 The district court shall retain jurisdiction of this cause for the purpose of issuing any and all additional orders as may become necessary to ensure that equal employment opportunities are provided for all employees and prospective employees without regard to race or color and that all effects of past discrimination based on race or color are eliminated.
 
 VII.
 BACKPAY
 
 136
 The Seventh Circuit has stated that the provisions of Sec. 2000e-5(g) which empowers the court to order such affirmative relief as may be appropriate "should be broadly read and applied so as to effectively terminate the practice and make its victims whole." Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 721 (7th Cir. 1969). In Hayes, supra, 456 F.2d at 121, Judge Dyer remanded the backpay issue to the district court although it had not been raised until the post-trial stage of the litigation. He reasoned, "We think that the broad aims of Title VII require that this issue be developed and determined. It should be fully considered on remand." The Fourth Circuit approved the district court's award of backpay in Robinson, supra, 444 F.2d 791. In answering the employer's contentions that backpay should not have been awarded in the absence of specific intent to discriminate and in light of the unsettled state of the law, the court commented:
 
 
 137
 The principal answer to both points is that back pay is not a penalty imposed as a sanction for moral turpitude; it is compensation for the tangible economic loss resulting from an unlawful employment practice. Under Title VII the plaintiff class is entitled to compensation for that loss, however benevolent the motives for its imposition.
 
 
 138
 Nor, as defendants contend, are damages so speculative here as to be punitive. Presumably the awards will be based on fixed wage rates and ascertainable periods of work. Any specific challenge to the method of determining back pay may be raised on appeal after the District Court has assessed the amounts to be paid. [Id. at 804.]
 
 
 139
 This court denied a backpay award in St. Louis-San Francisco Ry., supra, 464 F.2d 301, on the grounds that the employer had not acted in bad faith in refusing to implement the Government's proposed remedy because the Government had asked for too much. There, we also indicated that it would be impossible to compute backpay since it could not be determined when certain members of the discriminated-against group would have no longer qualified for backpay due to physical incapacitation.
 
 
 140
 The role that backpay plays in employment discrimination cases is twofold. First, as noted in Robinson, supra, 444 F.2d 791, it provides compensation for the tangible economic loss suffered by those who are discriminated against. Secondly, and even more importantly, because backpay awards act as a deterrent to employers and unions, such awards play a crucial role in the remedial process. Developments-Title VII, supra, 84 Harv.L.Rev. at 1163. They provide the spur or catalyst which causes employers and unions to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges of an unfortunate and ignominious page in this country's history. If backpay is consistently awarded, companies and unions will certainly find it in their best interest to remedy their employment procedures without court intervention, whether that intervention is initiated by the Government or by individual employees. We think that the courts have at this point sufficiently delineated what constitutes acceptable and nonacceptable employment practices in the areas of seniority and hiring so that neither employer nor union can in good faith claim that they are unaware of what standards are expected of them under Title VII of the Act. There, of course, will be those exceptional situations where an employer may justifiably and in good faith maintain an apparently nondiscriminatory employment practice of a type which has not received prior judicial determination as to its validity. We need not here determine whether an award of backpay is appropriate under such circumstances.
 
 
 141
 In the present case, analogous seniority systems and hiring practices have been found in violation of Title VII on numerous occasions. In addition, there is no merit to a contention that the employer in this case could not unilaterally change its seniority system or hiring practices. As pointed out in Robinson, supra, 444 F.2d at 799, "The rights assured by Title VII are not rights which can be bargained away-either by a union, by an employer, or by both acting in concert. Title VII requires that both union and employer represent and protect the best interests of minority employees. Despite the fact that a strike over a contract provision may impose economic costs, if a discriminatory contract provision is acceded to the bargainee as well as the bargainor will be held liable." (Footnote omitted.) See Hayes, supra, 456 F.2d at 118; Jacksonville Terminal Co., supra, 451 F.2d at 454; see also Vogler v. McCarty, Inc., 451 F.2d 1236, 1238 (5th Cir. 1971).
 
 
 142
 An argument that there could be no unilateral change might have been valid prior to the first renegotiation of the union-company contract in 1966. However, prior to that renegotiation, the employer had been put on notice that its hiring practices were not acceptable to the United States Government. As stated in the appellee's brief, the record showed "that since 1962 the plant had existed in the white heat of constant federal monitoring * * *." Yet, as evidenced by this lawsuit, neither Local 1744 nor the Company has demanded a significant modification of the contract despite renegotiations of the underlying agreement in 1969 and 1972. In any case, both the Company and Local 1744 are party defendants in this suit and there is not the slightest evidence that any other party is responsible for maintenance of the discriminatory aspects of the present seniority system.
 
 
 143
 Despite what we have said as to the appropriateness of backpay, we do not make such an award here. In this Circuit the law in regard to backpay has not been adequately defined to provide employers and unions with notice that they will be liable for a discriminatee's economic losses due to continuation of past or present discriminatory policies. However, where an employer and union have had ample opportunity to remedy an unlawful employment practice, they should be put on notice that they will be held responsible for the economic losses accruing to the parties injured by such unlawful employment practices.
 
 VIII.
 SUMMARY
 We briefly summarize:
 
 144
 (1) The record establishes that National Lead has violated Title VII in its employment practices relating to hiring and promotion of production workers, selection of foreman, and recruitment and hiring of clerical, secretarial, and laboratory (white-collar group) employees.
 
 
 145
 (2) We grant specific relief to workers assigned to the Labor department prior to March 14, 1963, who continue to suffer from the Company's segregated employment practice followed before that date. This relief includes carryover of Labor department seniority into other departments to which they may transfer and pay rate retention until better paying vacancies become available for bid by these new employees. We avoid reverse discrimination by authorizing plant seniority to govern job competition between blacks and whites, both hired before March 14, 1963, who compete in intradepartmental bidding on jobs.
 
 
 146
 (3) We direct that foremen be selected by merit from a roster of eligible candidates. The roster shall be open equally to whites and blacks. Until 15 blacks hold foremen positions, we direct that a one-white-to-one-black hiring ratio be utilized.
 
 
 147
 (4) We direct a change in recruitment and hiring procedures for white collar personnel to ensure that merit rather than skin color shall determine preference in hiring.
 
 
 148
 (5) We direct that the Company promulgate objective standards in its procedures relating to recruitment, hiring, and promotion of employees, and that the Company keep adequate records of its employment activities and make periodic reports to the court and to the United States Government to ensure compliance with the court's injunction.
 
 
 149
 (6) We direct the court to retain jurisdiction of this action and to reconsider the appropriateness of merger of all or parts of the Labor department (Labor seniority group) into other departments of the plant at a later date.
 
 
 150
 Reversed and remanded.
 
 APPENDIX
 I. RECORDS
 
 151
 National Lead shall maintain appropriate records of all hiring, assignments, promotions, disqualifications and dismissals, and shall allow the plaintiff, upon reasonable notice, to inspect, copy, duplicate, photograph or examine such records during normal business hours.
 
 II. REPORTS
 
 152
 In addition to the recording provisions in Section I above, National Lead shall file with the court and plaintiff within three months after the date of this order, and every six months thereafter, a report setting forth the following information:
 
 A. Current Hourly Production Employees
 
 153
 The report shall include the name, clock number, race, department, and seniority date of all bidders; the title of the job, rate of pay, and date the bid was posted for all jobs whether or not a member of the affected class actually bids on the opening. In addition, the report shall clearly indicate the successful bidder(s) and his new rate of pay along with the standard five-year rate for the job.
 
 B. Salaried Foreman Positions
 
 154
 The reports shall include in regard to each promotion or assignment of personnel to a supervisory or foreman position occurring during the reporting period:
 
 
 155
 (a) The job title, department, seniority unit, rate of pay and date of the promotion or assignment;
 
 
 156
 (b) The name, clock number, address, phone number, race, job title and date of initial employment of each employee considered or available for the promotion or assignment;
 
 
 157
 (c) The name, clock number, address, phone number, race, job title and date of initial employment of the employee promoted or assigned;
 
 
 158
 (d) If a black employee is available for the promotion or assignment, but a white is selected, the reasons therefor;
 
 
 159
 (e) If any black employee promoted under the terms of this order is terminated, laid off, or disqualified, the specific reasons therefor in nonconclusional terms along with that individual's identity.
 
 C. Hiring of Production Workers
 
 160
 The report shall include in regard to each vacancy in an hourly production worker position which occurs during the reporting period:
 
 
 161
 (a) The job title, department, seniority group, rate of pay, and date of vacancy;
 
 
 162
 (b) The name, address, phone number, referring agency, race, and date of application of each applicant considered or available for the vacancy;
 
 
 163
 (c) The name, address, phone number, race, and date of application of the applicant selected to fill the vacancy;
 
 
 164
 (d) The date and method of placement of job orders with minority agencies;
 
 
 165
 (e) If any black is rejected, the specific reasons therefor in nonconclusional terms;
 
 
 166
 (f) If any black employee hired under the terms of this order is terminated, laid off, or disqualified, the specific reasons therefor in nonconclusional terms along with that individual's identity.
 
 
 167
 D. Office, Clerical, and Laboratory Personnel
 
 
 168
 The report shall include in regard to each vacancy in an office, secretarial, clerical, or laboratory position which occurs during the reporting period:
 
 
 169
 (a) The job title, rate of pay, and date of the vacancy;
 
 
 170
 (b) The name, address, phone number, referring agency, race, and date of application of each applicant considered or available for the vacancy;
 
 
 171
 (c) The name, address, phone number, race, and date of application of the applicant selected to fill the vacancy;
 
 
 172
 (d) The date and method of placement of job orders with minority agencies;(e) If any black is rejected, the specific reasons therefor in nonconclusional terms;
 
 
 173
 (f) If any black employee hired under the terms of this order is terminated, laid off, or disqualified, the specific reasons therefor in nonconclusional terms along with that individual's identity;
 
 
 174
 (g) The name, address, date, and nature of contact of all community agencies contacted pursuant to this order.
 
 ON MOTION FOR EN BANC HEARING
 
 175
 As no judge has requested an en banc hearing, the motion for rehearing en banc is denied. The judges on the panel hearing this case deny the separate motions for rehearing made by appellees and appellants. We, however, add these comments.
 
 
 176
 Appellee, N. L. Industries, Inc., claims that in setting a reasonable goal of 15 black foremen out of 100, this court overlooked a recent 50 percent reduction in the work force. Our ruling was predicated upon the record made before the district court showing a work force in the number expressed in the opinion. Thus, any request for modification of the order based on substantially changed circumstances should be addressed to the district court for its consideration under guidelines enunciated in our opinion.
 
 
 177
 Moreover, contrary to the argument advanced by N. L. Industries, nothing in our opinion requires that unqualified persons be advanced to foremen positions or that the one-black-to-one-white ratio for selection of foremen requires exact alternation under circumstances where an applicant for foreman must possess specialty skills not common to those individuals carried on the foreman's roster, e. g., electrician. In those circumstances, temporary change in the alternation scheme will be acceptable, so long as the over-all one-to-one ratio is maintained.
 
 
 178
 N. L. Industries claims rate retention may produce reverse discrimination by permitting, in some instances, a member of the affected class to carry a wage rate into a new department higher than the rate of the highest paid position in that department. Wage rate retention may be limited to the highest level job in the particular department. United States v. Bethlehem Steel Corp., 446 F.2d 652, 666 (2d Cir. 1971).
 
 
 179
 Unusual problems which may arise under fact situations not encompassed by the present record should be presented to the district court for disposition under general guidelines as announced in our opinion.
 
 
 
 *
 Eastern District of Michigan, sitting by designation
 
 
 [1]
 The district court's opinion is reported at 338 F.Supp. 1167 (E.D.Mo.1972)
 
 
 [2]
 The district court denied all requests for relief notwithstanding that in our consideration of the Government's request for a preliminary injunction, we indicated that on the basis of the record before us, some form of relief was merited. National Lead Co., supra, 438 F.2d at 938
 
 
 [3]
 The 1972 bargaining agreement, although not before the district court, has been presented to us on appeal. The essentials of the seniority provisions remain unchanged from the earlier agreement presented to the district court
 
 
 [4]
 A dispute developed in testimony by witnesses called by the Company as to whether interdepartmental bidding under the 1969 contract was opened first to those occupying positions in the Mechanical department for one year or offered first on a plant seniority basis to personnel hired before March 14, 1963. The contract provisions gave preference to those in the Mechanical section. The practice, according to the plant manager, gave preference to employees hired before March 14, 1963. Apparently the 1972 contract provides for no preference for any department when a job opens for plantwide bidding
 
 
 [5]
 For example, Benny Tatum, a black employee initially assigned to the Labor department on the basis of race in 1950, bid into the Mechanical department in 1964. Between 1964 and 1966, his lack of seniority in the Mechanical department caused him to be bumped back into Labor four different times, and on the fourth bumpback to Labor, he was unable to return to Mechanical until 1969. Mr. Smith Moore, Mr. Leroy Lampkin, and Mr. Napoleon Wise transferred to other departments but each was bumped back into Labor several times
 
 
 [6]
 In Rowe, supra, 457 F.2d at 355, the court stated:
 [T]he problem is not whether the employer has willingly-yea, even enthusiastically-taken steps to eliminate what it recognizes to be traces or consequences of its prior pre-Act segregation practices. Rather, the question is whether on this record-and despite the efforts toward conscientious fulfillment-the employer still has practices which violate the Act.
 
 
 [7]
 Although the Company alleges that certain advantages accrue to some employees in the Labor department, the evidence indicates that no white employee has ever bid into that department. The fact that one black person earned more in 1969 than any other production worker and that some black laborers complete work quotas in less than the full eight hour shift, does not establish, in the light of actual race discrimination in assignment of employees, that this department as a whole is the most desirable place to work
 
 
 [8]
 Pool areas consisted of the lower paid jobs of one or more departments. An employee who was about to be laid off within a particular department could exercise plant-wide seniority and transfer into a pool job. Id. at 655
 
 
 [9]
 The court observed:
 In order to transfer to a formerly "white" department these employees were required to suffer an economic penalty, forfeiture of seniority rights and pay levels earned in the "black" department. The former was due to the use of departmental seniority, the latter to the fact that the transferee's new job was at a low paid entry level in the new department. Thus, to obtain an opportunity that had been denied them because of race, these employees had to be willing to give up what was already theirs because of service in the plant. Second, a transferee to a "white" department would never be able to reach the level of a white employee already there. For example, if a black and a white employee had been hired at the same time and the latter had been assigned to the more desirable "white" department, but the black had not been so assigned, the white started to accumulate department or unit seniority in that department but the black did not. Even if the black were given the chance years later to transfer into the "white" department, the earlier discriminatory job assignment had denied him the chance to earn seniority up to that time in the "white" department. Therefore, the use of departmental or unit seniority for purposes of promotion in the formerly "white" department continued the effect of the earlier discriminatory practice. [Id. at 658.]
 
 
 [10]
 In Bethlehem Steel, the court described a dual seniority system analogous to that in the instant case. Historically, blacks had been assigned to the least desirable jobs prior to the enactment of Title VII, without the opportunity of interdepartmental transfer. In 1965, employees could transfer to low level jobs which opened in other departments at the price of losing seniority for purposes of promotion. They were paid at the job rate for these new jobs and then entered the line of progression. In arguing against the remedy proposed by the Government, rate retention and seniority carryover, the company contended:
 that the irresistible advantage of rate retention and seniority carryover will lead to a wholesale depopulation of the 11 departments, that dangerous, skilled jobs will be filled by incompetents increasing the injury rates, that the preferential treatment of some employees will lead to labor unrest, and that the increased cost of production will render the plant uncompetitive. [Bethlehem Steel, supra, 446 F.2d at 662.]
 In unequivocally rejecting these arguments, the court stated:
 The seniority and transfer provisions at the plant have been found to perpetuate past discrimination, and the use of rate retention and seniority carryover will substantially eliminate these discriminatory effects. Therefore, the crucial question must be whether the basic goal of the seniority system will necessarily be frustrated by these remedies. It is perfectly clear that this will not be the case. An unqualified worker need not be promoted whether or not he is a transferee under the district court's order. [Id.]
 
 
 [11]
 If courts keep clear the distinction between remedial measures and preferential measures, they should not hesitate to remedy discrimination by means such as remedial training programs, even when the remedy is costly. The purpose of the Act, to prevent employment discrimination, requires that the costs be borne by the discriminatory employer or union. [Developments-Title VII, 84 Harv.L.Rev. 1109, 1149-50 (1971).]
 
 
 [12]
 From our analysis of the record, it appears that the Company utilizes various categories of supervisory personnel. The Government alleges that blacks have been largely excluded from the group that it refers to as "front line foremen," who are not union members and who are selected totally at the Company's discretion. This group is to be distinguished from the "working foremen" category, which is a bidding position based on seniority. Blacks have eventually qualified as working foremen in the department where they were permitted to work. For the purposes of this discussion, all references are to "front line foremen" unless otherwise indicated
 
 
 [13]
 The Government's contention here is analogous to the apothegm attributed to ancient sources and quoted by Judge Lay in his concurring opinion in Green v. McDonnell Douglas Corp., 463 F.2d 337, 344-345 (8th Cir. 1972), "They tie our hands and then reproach us that we do not use them."
 
 
 [14]
 Note, Title VII, Seniority Discrimination, and the Encumbent Negro, 80 Harv. L.Rev. 1260, 1268 n. 2 (1967)
 
 
 [15]
 The court also discounted the company's contention that morale would suffer if seniority carryover and rate retention were permitted. "Assuming arguendo that the expectations of some employees will not be met, their hopes arise from an illegal system. Moreover, their seniority advantages are not indefeasibly vested rights but mere expectations derived from a bargaining agreement subject to modification." Bethlehem Steel, supra, 446 F. 2d at 663
 
 
 [16]
 As in Bethlehem Steel, the court gave little weight to employee expectations:
 * * * Title VII guarantees that all employees are entitled to the same expectations regardless of "race, color, religion, sex, or national origin." Where some employees now have lower expectations than their co-workers because of the influence of one of these forbidden factors, they are entitled to have their expectations raised even if the expectations of others must be lowered in order to acieve the statutorily mandated equality of opportunity. [Robinson, supra, 444 F.2d at 800 (footnote omitted).]
 
 
 [17]
 In Hayes, supra, 456 F.2d at 116, the company adopted a plan, prior to resolution of the suit, whereby discriminatedagainst employees were permitted to retain their plantwide seniority and former wage rate
 
 
 [18]
 The collective bargaining agreement effective March 14, 1969, provides in Article IV, Section 7, relating to biddable jobs:
 When an employee bids on a new job and is the accepted bidder, he shall have six (6) days to qualify for said job. If he fails to qualify, said employee shall return to his old job without loss of seniority.
 The "biddable jobs" section of the current agreement, dated August 3, 1972, includes the same language plus this sentence:
 The decision of whether or not and when the employee is qualified for and becomes responsible for the job shall be solely the decision of management.
 Management's decision-making process here, under the injunctive order, must be based on reasonably objective standards of evaluation of workers.
 
 
 [19]
 The Government lists the following as appropriate agencies: the Urban League, the Human Development Corporation, the Missouri State Employment Service -minority group specialist, Work Opportunities, Inc., and any other community agency whose function is to place blacks